MELISSA TEMPEL,

       Plaintiff,

v.                                   Case No. 23-CV-1169

**SCHOOL DISTRICT OF WAUKESHA,**

**and**

**JAMES SEBERT,**

       Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Melissa Tempel files this response in opposition to Defendants' Motion to Dismiss. Contrary to Defendants' assertions, the Complaint does state First Amendment retaliation claims against both the School District of Waukesha ("District") and James Sebert ("Dr. Sebert"). In addition, Dr. Sebert is not entitled to qualified immunity. Accordingly, the Court should deny Defendants' motion.

## STATEMENT OF FACTS

Melissa Tempel is an author, public commentator, and educator. (Dkt. #1 ¶ 6). Prior to her termination, she was employed by the District as a first-grade dual-language educator at Heyer Elementary School. (Dkt. #1 ¶ 7).

The District has a Controversial Issues in the Classroom Policy (Board Policy 2240) ("Controversial Issues Policy"), which permits the Board to restrict instruction

01090870

on Controversial Issues. (Dkt. #1 ¶ 9). The Board has defined Controversial Issues as topics:

A. On which opposing points of view have been promulgated by responsible opinion;

B. Which may be the subject of intense public argument, disagreement or disapproval;

C. Which may have political, social or personal impacts on students and/or the community; and

D. Which is likely to arouse both support and opposition in the community.

Board Policy 2240. Since 2021, the District has received public criticism and media attention regarding its implementation and application of the Controversial Issues Policy and its handling of lesbian, gay, transgender, and queer ("LGBTQ+") issues. (Dkt. #1 ¶¶ 10-28, 41, 44-46, 53-55).

In early 2023, Heyer Elementary School planned to host a spring concert for kindergarten and first graders, in which students historically sing songs for their families and classmates. (Dkt. #1 ¶ 29). On March 21, 2023, the District advised the music teacher, who traditionally organizes the concert, that the singing of "Rainbowland" by Miley Cyrus and Dolly Parton at the 2023 Heyer spring concert was prohibited. (Dkt. #1 ¶¶ 30, 33). On March 24, 2023, the District issued a public statement to the media that the Principal of Heyer Elementary School and a central office administrator determined that "Rainbowland" could be deemed controversial under the Controversial Issues Policy. (Dkt. #1 ¶ 42).

Ms. Tempel has a personal account on the social media platform X, formerly known as Twitter, (hereinafter "Twitter") with the handle @melissatempel. (Dkt. #1

¶ 35). The account is public—that is, anyone can view and interact with her tweets. (Dkt. #1 ¶ 36). Ms. Tempel did not have any social media accounts, including Twitter, in her capacity as a District employee, and she did not use her Twitter account, or any other social media, in the course of her official duties as an employee of the District. (Dkt. #1 ¶¶ 37-38).

On March 21, 2023, at 6:39 p.m. CT, Ms. Tempel tweeted:



(Dkt. #1 ¶ 40).

In the subsequent days, the tweet gained national attention with news outlets. (Dkt. #1 ¶ 41). Between March 22, 2023, and March 31, 2023, news outlets interviewed Ms. Tempel during her off-duty time about the District's decision

regarding "Rainbowland," the application of the Controversial Issues Policy, and other related issues. (Dkt. #1 ¶ 44). Ms. Tempel conducted these interviews off District premises, during personal time, and, at times, when the District was out of session for spring break. (Dkt. #1 ¶¶ 43-45). News outlets also interviewed parents and community members about these topics. (Dkt #1 ¶ 46).

On March 31, 2023, Dr. Sebert and District School Board ("Board") President Kelly Piacsek issued a public statement in which Dr. Sebert and the Board, among other things, reprimanded Ms. Tempel for her tweet and interviews. (Dkt. #1 ¶ 47).

On April 3, 2023, Ms. Tempel attempted to return to work, but the District placed her on administrative leave. (Dkt #1 ¶¶ 48-49). The District also called law enforcement to meet Ms. Tempel at the doors of Heyer Elementary School, despite the fact that she had neither been accused or suspected of criminal or disorderly conduct, nor had she engaged in activity from which a reasonable District administrator could believe that she posed the potential for engaging in criminal or disorderly conduct. (Dkt. #1 ¶ 50).

The public protested the District's application of the Controversial Issues Policy to "Rainbowland" as well as Ms. Tempel's forced leave. (Dkt. #1 ¶¶ 53-55). The media also reported on these items. (Dkt. #1 ¶ 52).

Dr. Sebert commissioned an investigative report from District Assistant Superintendent Sharon Thiede ("Ms. Thiede") into Ms. Tempel, her tweet, and her interviews. (Dkt #1 ¶ 56). Ms. Thiede issued her investigative report ("Thiede Investigative Report") in which she concluded that Ms. Tempel violated Page 7 of the

Employee Handbook for Professional Staff Members, Board Policy 3170, Board Policy 3213, Board Policy 3310. (Dkt. #1 ¶ 59). In a letter addressed to Ms. Tempel ("Sebert Letter"), Dr. Sebert adopted the finding of the Thiede Investigative Report and recommended to the Board that it terminate Ms. Tempel. (Dkt #1 ¶¶ 60-61). On July 12, 2023, the Board unanimously voted to adopt Dr. Sebert's recommendation and terminate Ms. Tempel.

## LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a complaint. *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). "Our system operates on a notice pleading standard; *Twombly* and its progeny do not change this fact." *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 603 (7th Cir. 2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Berger v. NCAA*, 843 F.3d 285, 290 (7th Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In assessing whether a complaint states a claim that is plausible on its face, the court must accept "well-pleaded facts as true[] and draw all inferences in [the non-moving party's] favor." *Id.* (quoting *Bell v. City of Chicago*, 835 F.3d 736, 738 (7th Cir. 2016)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. "[T]he plaintiff must give enough details about the subject-matter of the case to present a story that holds together. In other words, the court will ask itself *could* these things have happened, not *did* they happen." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (emphasis original).

## ARGUMENT

Ms. Tempel brings First Amendment retaliation claims against the District and Dr. Sebert under 42 U.S.C. § 1983. "To state a claim for relief under 42 U.S.C. § 1983, a plaintiff must allege that: (1) [s]he was deprived of a right secured by the Constitution or laws of the United States; and (2) the deprivation was visited upon h[er] by a person or persons acting under color of state law." *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

"The First Amendment, incorporated against the states through the Fourteenth Amendment, shields government employees from retaliation for engaging in protected speech." *Diadenko v. Folino*, 741 F.3d 751, 755 (7th Cir. 2013). To state a First Amendment retaliation claim, a public employee must allege "(1) h[er] speech was constitutionally protected, (2) [s]he has suffered a deprivation likely to deter speech, and (3) h[er] speech was at least a motivating factor in the employer's action." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013).

Defendants contend that the Complaint fails to state a First Amendment retaliation claim against the District because Ms. Tempel did not engage in protected speech and her speech was not a motivating factor of the District's actions. Defendants also contend that the Complaint fails to state a First Amendment retaliation claim against Dr. Sebert for the additional reasons that Dr. Sebert was not acting under color of state law, that Ms. Tempel's speech was not a motivating factor of Dr. Sebert's actions, and that Dr. Sebert is entitled to qualified immunity.

Defendants' arguments—some of which border on frivolous—are all unavailing. The Complaint does indeed state First Amendment retaliation claims

6

against the District and Dr. Sebert, and Dr. Sebert is not entitled to qualified immunity. Accordingly, the Court should deny Defendants' motion.

## I. The Complaint states a First Amendment retaliation claim against the District.

### A. Ms. Tempel's speech was constitutionally protected.

"For a public employee's speech to be protected under the First Amendment, the employee must show that (1) [s]he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) h[er] interest in expressing that speech was not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" *Swetlik*, 738 F.3d at 825 (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)).

#### 1. Ms. Tempel spoke as a private citizen.

"[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

Defendants contend that Ms. Tempel was speaking pursuant to her official duties as a District teacher, not as a private citizen, because her Twitter display name was "Maestra Melissa" (i.e., Teacher Melissa), she referred to "my first graders," "our concert," and "our administration" in her tweet, and she tagged the District in that tweet. (Dkt. #7 at 9). Simply put, Defendants contend that Mr. Tempel did not speak as a private citizen because her tweet related to her public employment.

Defendants' arguments represent a fundamental misunderstanding of the *Garcetti* inquiry. "*Garcetti* said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment." *Lane v. Franks*, 573 U.S. 228, 239 (2014). Rather, the *Garcetti* Court explicitly held that "[t]he First Amendment protects some expressions related to the speaker's job." *Garcetti*, 547 U.S. at 421. Thus, while the *Garcetti* Court acknowledged that the employee's speech "concerned the subject matter of [his] employment," it nonetheless stated that fact was "nondispositive." *Id.* If *Garcetti* left any doubt about that issue, the Court explicitly rejected Defendants' argument in *Lane*: "The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane*, 573 U.S. at 240.

Indeed, the Supreme Court has emphasized its "precedents dating back to *Pickering* [*v. Board of Education*, 391 U.S. 563 (1968),] have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Id.* That is because "[t]he interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it." *Id.* at 236 (quoting *San Diego v. Roe*, 543 U.S. 77, 82 (2004) (per curiam)). In fact, the Supreme Court has explicitly recognized this principle for public school teachers:

> Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how

> funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal.

*Pickering*, 391 U.S. at 572.

Properly understood, then, "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at 240. In other words, were Ms. Tempel's tweet and interviews "speech the government 'itself had commissioned or created' and speech the employee was expected to deliver in the course of carrying out [her] job"? *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2424 (2022) (quoting *Garcetti*, 547 U.S. at 422) (cleaned up). Accepting the allegations in the Complaint as true, the answer is emphatically, "No."

Ms. Tempel's tweet and subsequent interviews are clearly not speech within the scope of her duties as a District teacher. Ms. Tempel did not have her Twitter account in her capacity as a District employee, and she did not use her Twitter account in the course of her official duties. (Dkt. #1¶¶ 37-38). That she used a display name of "Maestra Melissa," spoke about school issues, and tagged the District is of no event given the Supreme Court's acknowledgment that teachers are "the members of a community most likely to have informed and definite opinions as to" school policies and that "it is essential that they be able to speak out freely on such questions." *Pickering*, 391 U.S. at 572.

The timing and circumstances of Ms. Tempel's tweet and subsequent interview also confirm that she spoke as a private citizen. *See Kennedy*, 142 S. Ct. at 2425. Ms.

Tempel delivered each instance of speech at issue here outside of work hours and off District property. (Dkt. #1¶¶ 40, 43-45). Several interviews even took place when the District was on spring break and not in session. (Dkt. #1 ¶ 43-44). By reasonable inference, Ms. Tempel was therefore not instructing her students, creating lesson plans, or engaging in other teacher duties when she tweeted and was interviewed.

The Complaint clearly alleges facts that demonstrate that Ms. Tempel's tweet and subsequent interviews did not "ow[e their] existence to [her] professional responsibilities." *Garcetti*, 547 U.S. at 421. Therefore, the Complaint alleges that Ms. Tempel engaged in speech as a private citizen.

### 2. Ms. Tempel spoke on issues of public concern.

"The Supreme Court has defined 'public concern' to mean 'legitimate news interest,' or "a subject of general interest and of value and concern to the public at the time of publication.'" *Kubiak v. City of Chicago*, 810 F.3d 476, 482 (7th Cir. 2016) (quoting *Meade v. Moraine Valley Cmty. Coll.*, 770 F.3d 680, 684 (7th Cir. 2014)). "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). "Of these three considerations, content is the most important." *Meade,* 770 F.3d at 684.

Defendants contend that Ms. Tempel did not speak on an issue of public concern because her speech was "a classic gripe about management." (Dkt. #7 at 10). Curiously absent from Defendants' arguments on this point is any assessment of the content, form, and context of Ms. Tempel's speech.

The content of Ms. Tempel's tweet and interviews concerned the District's decision regarding "Rainbowland," the application of Controversial Issues Policy, and other related issues. The tweet included the following specific content:



My first graders were so excited to sing Rainbowland for our spring concert but it has been vetoed by our administration. When will it end?
@waukeshaschools @DollyParton @MileyCyrus @mileyworld @gsafewi @CivilRights #publicschools

Where everything goes as planned
And I smile
'Cause I know if we try, we could really make a difference in this world
I won't give up, I'll sleep a wink
It's the only thought I think, you know where I stand
I believe we can start living in a Rainbowland

Living in a Rainbowland
Where you and I go hand in hand
Oh, I'd be lying if I said this was fine
All the hurt and the hate going on here
We are rainbows, me and you
Every color, every hue
Let's shine on through
Together, we can start living in a Rainbowland

Living in a Rainbowland
The skies are blue and things are grand
Wouldn't it be nice to live in paradise
Where we're free to be exactly who we are
Let's all dig down deep inside
Brush the judgment and fear aside
Make wrong things right
And end the fight
'Cause I promise ain't nobody gonna win (come on)

(Dkt. #1 ¶ 40).

The content of the tweet demonstrates that Ms. Tempel expressed her concern with the District's treatment of diversity, inclusion, discrimination, and LGBTQ+ issues. The tweet includes a rainbow—a symbol of LGBTQ+ pride—and the song's lyrics, which include lines such as, "Wouldn't it be nice to live in paradise / Where we're free to be exactly who we are / Let's all dig down deep inside / Brush the judgment and fear aside / Make wrong things right / and end the fight." Ms. Tempel also tags the Gay Straight Alliance for Safe Schools of Wisconsin (@gsafewi) and the Civil Rights Division of the

11

U.S. Department of Justice (@CivilRights) and uses the hashtag #publicschools. The content of Ms. Tempel's tweet therefore clearly demonstrates that her speech is more than a mere employment gripe, but rather a statement about political and social matters that extend far beyond her role as a first-grade teacher.

Moreover, the District's own decision to label the song as controversial pursuant to the Controversial Issues Policy supports the conclusion that these issues are matters of public concern. *See* Board Policy 2240 (defining Controversial Issues as those "on which opposing points of view have been promulgated by responsible opinion; [w]hich may be the subject of intense public argument, disagreement or disapproval; [w]hich may have political, social or personal impacts on students and/or the community; and [w]hich is likely to arouse both support and opposition in the community.").

The context in which Ms. Tempel spoke about these issues also supports the conclusion that she spoke on a matter of public concern. Ms. Tempel's speech came after over a year of public criticism and media attention about the District's implementation and application of its Controversial Issues Policy. (Dkt. #1 ¶¶ 9-28). In July 2021, the District suspended diversity, equity and inclusion training for staff and suspended the work of the District's Equity Leadership Team. (Dkt. #1 ¶ 14). Then, in August 2021, Dr. Sebert announced that the Controversial Issues Policy would apply to ban Black Lives Matter, Blue Lives Matter, Thin Blue Line, anti-racist, and other materials, and the District asked teachers to remove all such materials from their classrooms. (Dkt. #1 ¶ 10). Over the 2021-2022 school year, the District applied the Controversial Issues Policy to ban LGBTQ+ Pride flags, safe space signs, and even displays of the District's own Nondiscrimination and Access to

Equal Educational Opportunity Policy (Board Policy 2260). (Dkt. #1¶ 12). The policy was applied to signs that stated, "This classroom is anti-racist" and "This school welcomes you." (Dkt. #1 ¶ 12). The District also failed to report at least one incident of harassment toward an LGBTQ+ student to the Department of Public Instruction, as required. (Dkt. #1 ¶ 20). In December 2021, the District suspended a teacher without pay for pinning a LGBTQ+ Pride flag in her classroom and refusing to take it down. (Dkt. #1 ¶ 22).

These issues continued, and in January 2023, the District updated its dress code policy to include the following prohibitions on speech: "[S]taff are not permitted to wear or display on their person any item (e.g. symbols, graphics, images, or text) while at work that may be considered political, controversial, or divisive, or which is likely to distract from student learning, disrupt the school environment, or cause disharmony in the workplace. This includes, but is not limited to, clothing and/or accessories, such as lanyards, masks, and pins/buttons." (Dkt. #1 ¶ 27). Dr. Sebert made clear that this change was intended to address rainbows and "Safe Space for All" buttons – specifically to prohibit them, pursuant to the Controversial Issues Policy. (Dkt. #1 ¶ 28).

The public took notice of the District's action and organized against it. (Dkt. #1 ¶¶ 16, 18, 20, 23-26). For example, community organizations sent public letters and signed petitions denouncing the District's actions. (Dkt. #1 ¶¶ 16, 18, 23-24). Parents and former teachers also testified at school board meetings against the District's

actions. (Dkt. #1 ¶¶ 25-26). Moreover, the press covered the District's actions and the opposition it engendered throughout these years. (Dkt. #1 ¶ 11, 15, 17, 19 21).

In this context, Ms. Tempel's tweet and interviews concerning the District's decision regarding "Rainbowland," the application of Controversial Issues Policy, and other related issues are clearly not isolated workplace gripes. Instead, Ms. Tempel added her voice to a public movement that was criticizing the District for its treatment of diversity, inclusion, discrimination, and LGBTQ+ issues. Criticism of public officials or government policies is a quintessential issue of public concern. *See Darlingh v. Maddaleni*, No. 22-CV-1355-SCD, 2023 U.S. Dist. LEXIS 57756, at *21 (E.D. Wis. Mar. 13, 2023) (collecting cases).

Finally, the form of Ms. Tempel's speech also supports the conclusion that she spoke on a matter of public concern. Ms. Tempel tweeted to the public, (Dkt. #1 ¶ 36), and spoke on the news. (Dkt. #1¶¶ 44-45). Ms. Tempel did not make her speech in the form of a private grievance or statement to her supervisor. *See, e.g.*, *Bivens v. Trent*, 591 F.3d 555, 561 (7th Cir. 2010) (union grievance indicates private concern); *Kubiak*, 810 F.3d at 483 (report to supervisors indicates private concern). She used two forms of media that were open and readily accessible to the public.

Accordingly, the Complaint clearly alleges that Ms. Tempel spoke on a matter of public concern.

### 3. Ms. Tempel's free speech interests outweigh the District's employment interests.

Given the fact-specific nature of *Pickering* balancing, it "can seldom be done on the basis of the pleadings alone." *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir.2002); *see also Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir.1997) ("*Gustafson I*")

("Normally, application of the Pickering balancing test will be possible only after the parties have had an opportunity to conduct some discovery."). Even so, accepting the allegations in the Complaint as true—and rejecting Defendants attempts to launder their self-serving allegations in the Thiede Investigative Report and Sebert Letter, *see infra*, Section I.A.III.a—*Pickering* balancing weighs in Ms. Tempel's favor.

*Pickering* balancing requires the Court to consider whether Ms. Tempel's interest, 'as a citizen, in commenting upon matters of public concern' outweighs the [the government's] interest, 'as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Kristofek v. Vill. of Orland Hills*, 832 F.3d 785, 795 (7th Cir. 2016) (quoting *Pickering*, 391 U.S. at 568). Courts consider several factors in *Pickering* balance:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Id.* (quoting *Greer v. Amesqua*, 212 F.3d 358, 371 (7th Cir. 2000)).

The Supreme Court has further emphasized that "when a public employee's speech has touched upon a matter of 'strong public concern,' the government employer typically must 'offer particularly convincing reasons to suppress it.'" *Id.* (quoting *Gustafson I*, 117 F.3d at 1019); *see also Stump v. Richland Twp.*, 278 F. App'x 205, 207 (3d Cir. 2008) ("It should not be the least surprising that accusations of

impropriety would cause some disruption; that does not necessarily negate the public nature of those accusations. . . . An employee's interest in exposing wrongdoing by public officials outweighs any incidental disruption that follows. It would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office.. . . Disruption, even to the extent of demoralization, is not enough to overcome the First Amendment's protection of the public nature of such speech.") (cleaned up).

Here, there is no allegation in the Complaint that Ms. Tempel's speech created problems in maintaining discipline or harmony among co-workers. In fact, the Complaint explicitly alleges that Ms. Tempel "had neither been accused or suspected of criminal or disorderly conduct, nor had she engaged in activity from which a reasonable District administrator could believe that she posed the potential for engaging in criminal or disorderly conduct." (Dkt. #1 ¶ 50). Second, Ms. Tempel's position as a teacher is not the type of employment relationship for which personal loyalty and confidence are necessary. *See Pickering*, 391 U.S. at 570 (Teacher's "employment relationships with the Board and, to a somewhat lesser extent, with the superintendent are not the kind of close working relationships for which it can persuasively be claimed that personal loyalty and confidence are necessary to their proper functioning."). Third, Ms. Tempel's speech did not impede her ability to perform her responsibilities. Ms. Tempel engaged in her speech outside of school hours and off District property, which meant that it did not impact her ability to teach

and instruct her children. (Dkt. #1 ¶¶ 40, 43-45). Fourth, and relatedly, the time, place, and manner of Ms. Tempel's speech—outside of work hours and off District property—weigh in her favor. (Dkt. #1 ¶¶ 40, 43-45). Fifth, as explained above, *supra* Section I.A.2, Ms. Tempel's speech came in the context of sustained public criticism and media attention about the District's implementation and application of its Controversial Issues Policy. (Dkt. #1 ¶¶ 9-28). The District had been facing public scrutiny and protests for years leading up to Ms. Tempel's speech and there is no indication that the District was disrupted during those years. This factor, too, weighs in Ms. Tempel's favor. Sixth, the yearslong public criticism and media attention and the Board's own definition of Controversial Issues indicate that Ms. Tempel's speech was on a matter for which debate is vital—that is, diversity, inclusion, discrimination, and LGBTQ+ issues in public education. Seventh, and finally, Ms. Tempel should be regarded as a member of the general public. While Ms. Tempel identified herself as a District teacher, she did not engage in her speech during work, on District property, or pursuant to her official duties, all of which demonstrates that she should be viewed as speaking a member of the general public. *Cf. Gonzalez v. City of Chicago*, 239 F.3d 939, 941 (7th Cir. 2001) ("As the district court stated, 'these reports were created in the scope of Gonzalez's ordinary job responsibilities. This fact lends support for the conclusion that Gonzalez was not acting as a concerned citizen or member of the general public, but merely as an employee.").

Since all seven of the *Pickering* factors weigh in Ms. Tempel's favor, her "speech interest was strong, and 'the stronger the employee's interest in speaking, the more substantial a showing the [government] must make to justify its restriction of that

speech.'" *Gazarkiewicz v. Town of Kingsford Heights*, 359 F.3d 933, 944 (7th Cir. 2004) (quoting *Gustafson v. Jones*, 290 F.3d 895, 909 (7th Cir. 2002) ("*Gustafson II*")). Defendants cannot meet this standard. In fact, Defendants failed altogether to assess the *Pickering* factors in their brief. Accordingly, Ms. Tempel's tweet and interviews are clearly constitutional protected speech.

### a. The Court should not consider the Thiede Investigative Report or Sebert Letter or accept the allegations in those documents are true in deciding Defendants' Motion to Dismiss.

As mentioned above, to establish the District's employment interests, Defendants rely on the content of the Sebert Letter and Thiede Investigative Report. This is improper. The Court should not consider these documents in deciding Defendants' Motion to Dismiss. However, even if the Court does consider the documents, it should not accept the *content* of the Sebert Letter and the Thiede Investigative Report as true.

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d). Rule 10(c) provides, in turn, that "[a] copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." FED. R. CIV. P. 10(c). The Seventh Circuit has extended the logic of Rule 10(c) to create a "narrow exception" to the rule that matters outside of the pleadings may not be considered on a motion to dismiss. *See 188 LLC v. Trinity Indus. Inc.*, 300 F.3d 730, 735 (7th Cir. 2002). "It is . . . well-settled in this circuit that 'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'" *Id.*

(quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)). "[T]his exception is 'aimed at cases interpreting, for example, a contract.'" *Id.* (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)).

Although Ms. Tempel referred to the Sebert Letter and the Thiede Investigative Report in the Complaint, neither document is central to her First Amendment retaliation claims. Ms. Tempel's claims against the District and Dr. Sebert are not contractual, and the Sebert Letter and Theide Report do not govern Ms. Tempel's rights or obligations, as a contract would. Regardless of whether Dr. Sebert wrote Ms. Tempel a letter explaining his decision to recommend her termination to the Board, Ms. Tempel would still have a claim against Dr. Sebert for the mere act of recommending her termination. Although the documents provide ammo for Defendants' defenses, courts have concluded that documents that support a defendant's defenses are not central to a plaintiff's claim. *See, e.g.*, *Hepp v. Ultra Green Energy Servs., LLC*, No. 13 C 4692, 2014 U.S. Dist. LEXIS 173962, at *10 (N.D. Ill. Dec. 17, 2014).

Even if the Court concludes that the Sebert Letter and the Thiede Investigative Report are central to Ms. Tempel's claims and thus part of the pleadings, the Court should not accept the allegations in documents as true. "Rather than accepting every word in a unilateral writing by a defendant and attached by a plaintiff to a complaint as true, it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents." *N. Ind. Gun & Outdoor Shows v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998). Based on the

19

nature of her claims, as well as how these documents are referenced in the Complaint, Ms. Tempel clearly did not intend to affirm the allegations contained therein. *Id.* at 456 ("A party that has sought to abridge another's constitutional rights would be unlikely to call attention to its actions by directly stating that prohibiting the group from exercising its constitutional rights was the purpose behind a policy."); Further, Dr. Sebert and Ms. Thiede are not disinterested authors. *Id.* ("Letters written by the defendant, however, may contain self-serving statements not constrained by negotiations.").

### B. Ms. Tempel's speech was at least a motivating factor of the District's actions.

Causation cannot realistically be disputed in this case. Defendants contend that Ms. Tempel was terminated because of the manner of her speech. That, however, is not a question of causation, but rather a consideration under *Pickering* balancing. The admission that Ms. Tempel's speech caused her termination is enough to defeat Defendants' arguments on the causation prong.

Even so, at the motion to dismiss stage, a plaintiff need only allege facts from which the Court can reasonably infer that her protected speech was a motivating factor in the defendant's actions. *Swetlik*, 738 F.3d at 825. "[T]he issue of causation is generally 'a factual matter' that is 'best answered by the traditional finder of fact' and not by a court at the pleading stage." *Carroll v. City of Oak Forest*, No. 19-cv-07412, 2020 U.S. Dist. LEXIS 86612, at *10 (N.D. Ill. May 18, 2020) (quoting *Volkman v. Ryker*, 736 F.3d 1084, 1089 (7th Cir. 2013)).

In this case, Dr. Sebert commissioned the Thiede Investigative Report, which concluded that Ms. Tempel violated Page 7 of the Employee Handbook for Professional Staff Members, Board Policy 3170, Board Policy 3213, Board Policy 3310 when she posted on social media and spoke to news outlets about the District's decision regarding "Rainbowland," the District's application of Controversial Issues Policy, and related issues." (Dkt. #1 ¶¶ 56, 59). Dr. Sebert notified Ms. Tempel that he had adopted the investigative report's findings and would recommend that the Board terminate Ms. Tempel's employment because her speech violated the aforementioned policies. (Dkt. #1 ¶ 60). The Board then voted unanimously to adopt Dr. Sebert's recommendation and terminate Ms. Tempel. (Dkt. #1 ¶ 64).

Considering these allegations, the Court can reasonably infer that Ms. Tempel's speech was a motivating factor—and, in fact, the but-for cause—of the District's actions. Accordingly, the Complaint alleges a causal connection between Ms. Tempel's speech and the District's action.

## II. The Complaint states a First Amendment retaliation claim against Dr. Sebert.

### A. Dr. Sebert was acting under color of state law.

"Action is taken under color of state law when it involves a misuse of power, 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Honaker v. Smith*, 256 F.3d 477, 484-85 (7th Cir. 2001) (quoting *Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997)). The action must be "related in some way to the performance of the duties of the state office." *Id.*

Defendants contend that Dr. Sebert did not take any of the actions alleged in the Complaint pursuant to state law. This argument—which borders on frivolous—is in direct contravention to Wisconsin law and Board policy.

Wisconsin law confers specific duties on school district superintendents. Wis. Stat. § 118.24(2); *see also id.* § 115.001(8) (defining "school administrator" to include superintendent). Generally speaking, "[u]nder the direction of the employing school board, the [superintendent] shall have general supervision and management of the professional work of the schools and the promotion of pupils." *Id.* § 118.24(2)(a). Moreover, "[t]he [superintendent] shall make written recommendations to the school board on teachers, courses of study, discipline and such other matters as the administrator thinks advisable and shall perform such other duties as the school board requires." *Id.*

The Board has exercised its authority to impose other duties and guidelines on the District superintendent and has outlined those items in Board policies, which, as municipal policies, the Court may take judicial notice of. *Newcomb v. Brennan*, 558 F.2d 825, 829 (7th Cir. 1977). Board Policy 1400 defines the job responsibilities of the District superintendent, which include:

- The Superintendent, as the chief executive officer, will coordinate a management team consisting of the Board of Education and all administrative personnel.

- The Superintendent shall assume complete responsibility for the evaluation of personnel who report directly to him/her and review the evaluation of all other administrators and teaching personnel of the District.

- The Superintendent or designee shall be responsible for recruitment, selection, and assignment of the employees needed by the District and

for establishing an appropriate procedure for recommending personnel for employment.

- The Superintendent shall ensure that employee discipline is administered fairly and consistently in accordance with all policies, contracts, and laws.

- Suspension of employees or students may be made at any time by the Superintendent or designee. Recommendation for dismissal of employees or expulsion of students shall be acted upon by the Board of Education and will be in accordance with law.[1]

- The Superintendent shall keep the Board of Education apprised of the success of policies adopted, the general condition of the District, and problems requiring Board of Education consideration.

- The Superintendent shall notify all members of the Board of Education of all regular and special meetings, and attend all regular and special meetings of the Board of Education unless specifically excused by the Board President.

Board Policy 1400. In addition, "[t]he Superintendent may issue discipline when s/he deems appropriate." Board Policy 3139.

As alleged in the Complaint, Dr. Sebert played an integral part in Ms. Tempel's termination. He issued a statement on March 31, 2023, in which he publicly reprimanded Ms. Tempel for how she handled her criticism of the District's decision regarding "Rainbowland," the application of Controversial Issues Policy, and other related issues. (Dkt. #1 ¶ 47). He then commissioned the Thiede Investigative Report into Ms. Tempel's private, off-duty speech on social media and with news outlets. (Dkt. #1 ¶ 56). Finally, he recommended Ms. Tempel's termination to the Board. (Dkt. #1 ¶ 61).

---

[1] Incredibly, Defendants assert: "Plaintiff alleges Dr. Sebert made a recommendation to the Board in favor of terminating Plaintiff's employment after adopting the findings of an investigation into Plaintiff's misconduct. However, a mere recommendation is not an official action." (Dkt. #7 (citations omitted)). This assertion is clearly legally and factually baseless given the Board's explicit policy conferring Dr. Sebert with the power to make recommendations regarding dismissal to the Board.

Each of these actions relate to Dr. Sebert's duties as District superintendent—duties that owe their existence to Wisconsin law (Wis. Stat. § 118.24(2)) and Board policies (Board Policies 1400 and 3139). Dr. Sebert could not have taken these actions without his authority as District superintendent. Accordingly, the Complaint alleges that Dr. Sebert acted under color of state law.[2]

## B. Ms. Tempel suffered deprivations likely to deter speech.

"The First Amendment requires a deprivation 'likely' to deter free speech, a standard considered more lenient than the Title VII counterpart of adverse action." *Hobgood v. Ill. Gaming Bd.*, 731 F.3d 635, 643 (7th Cir. 2013) Thus, the Seventh Circuit has recognized "that, for public employees, even relatively minor personnel actions can chill First Amendment activity." *Douglas v. Reeves*, 964 F.3d 643, 648 (7th

---

[2] Defendants emphasize that Dr. Sebert is sued in his individual capacity. They appear to confuse this with alleging that Dr. Sebert acted as a private individual. However, the purpose of pleading the capacity in which a defendant is sued is to clarify who is the "person" being sued under Section 1983. As the Supreme Court has summarized:

> State officers sued for damages in their official capacity are not "persons" for purposes of the suit because they assume the identity of the government that employs them. By contrast, officers sued in their personal capacity come to court as individuals. A government official in the role of personal-capacity defendant thus fits comfortably within the statutory term "person."

*Hafer v. Melo*, 502 U.S. 21, 27 (1991) (internal citations omitted).

To the extent Defendants argue that Dr. Sebert cannot be sued under Section 1983 because his acted in his individual capacity, the Supreme Court has already roundly rejected such an argument as "unpersuasive," a "novel proposition," "without support in the broad language of Sec. 1983," and something that "cannot be reconciled with our decisions." *Id.* at 27-28.

Defendants also contend that Dr. Sebert would be immune from damages under the Eleventh Amendment if he was sued in his official capacity. This is utterly wrong. Officials sued in their official capacity "assume the identity of the government that employs them." *Id.* at 27. Thus, if Dr. Sebert were sued in his official capacity, he would assume the identity of the District. The District is a municipal body, which are not immune from damages under Section 1983. *See, e.g., Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 281 (1977); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468-70 (7th Cir. 2001) (recognizing Wisconsin school districts are subject to municipal liability under Section 1983).

Cir. 2020); *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (citing *Bart v. Telford*, 677 F.2d 622, 624 (7th Cir. 1982)) ("Any deprivation under color of law that is likely to deter the exercise of free speech, whether by an employee or anyone else, is actionable, even something as trivial as making fun of an employee for bringing a birthday cake to the office to celebrate another employee's birthday, if (an important qualification, emphasized in *Bart*) the circumstances are such as to make such a refusal an effective deterrent to the exercise of a fragile liberty.")

Dr. Sebert can be held liable for Ms. Tempel's termination. He played an integral role in having the Board approve his recommendation for termination, and when "two or more defendants actively participate in a constitutional violation, they can be held jointly and severally responsible." *Molnar v. Booth*, 229 F.3d 593, 605 (7th Cir. 2000). Dr. Sebert's conduct outside of the District's decision to terminate Ms. Tempel also rises to the level of deprivation likely to deter speech. Dr. Sebert issued a statement on March 31, 2023, in which he publicly reprimanded Ms. Tempel for how she handled her criticism of the District's decision regarding "Rainbowland," the application of Controversial Issues Policy, and other related issues. (Dkt. #1 ¶ 47). He then commissioned the Thiede Investigative Report into Ms. Tempel's private, off-duty speech on social media and with news outlets. (Dkt. #1 ¶ 56). Finally, he recommended Ms. Tempel's termination to the Board. (Dkt. #1 ¶ 61). These actions are the deprivations that serve as the basis for Ms. Tempel's claim against Dr. Sebert and are likely to deter speech.

### C. Ms. Tempel's speech was at least a motivating factor of Dr. Sebert's actions.

As explained above, *supra* Section II.B, the Court can reasonably infer that Ms. Tempel's speech was a sufficient condition, if not necessary condition, for Dr. Sebert's actions. Ms. Tempel's speech is the focus of each of Dr. Sebert's actions as well as this lawsuit and disclaiming a causation between the two is incredible. Accordingly, the Complaint alleges causation between Ms. Tempel's speech and Dr. Sebert's actions.

### D. Dr. Sebert is not entitled to qualified immunity.

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). At the motion to dismiss stage, the court must consider "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Id.*

Ms. Tempel has already established in the preceding sections that the Complaint alleges Dr. Sebert violated her First Amendment rights by playing an integral role in her termination, publicly reprimanding Ms. Tempel for her criticism of the District, (Dkt. #1 ¶ 47), directing Ms. Thiede to investigate Ms. Tempel's speech, (Dkt. #1 ¶ 56), and recommending that the Board terminate Ms. Tempel's employment, (Dkt. #1 ¶ 61). Therefore, to defeat Dr. Sebert's assertion of qualified immunity, Ms. Tempel must show that her First Amendment rights were clearly established—or, put differently, that "the wrongfulness of the defendant's conduct was clearly established." *Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021).

To do so, Ms. Tempel must "show either a reasonably analogous case that has both articulated the right at issue and applied it to a factual circumstance similar to the one at hand or that the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law." *Leiser v. Kloth,* 933 F.3d 696, 701 (7th Cir. 2019*)* (quoting *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017)). "This requirement does not mean that a plaintiff must be able to point to a case 'on all fours' with the defendant['s] misconduct." *Howell v. Smith*, 853 F.3d 892, 897 (7th Cir. 2017). However, she must "show some settled authority that would have shown a reasonable [official] in [the defendant's] position that h[is] alleged actions violated the Constitution." *Leiser*, 933 F.3d at 702.

Since at least 1968, it has been clearly established that public school teachers have a right to be free from retaliation, such as a termination, because they engaged in constitutionally protected speech. *See Pickering*, 391 U.S. at 574. It has also been clearly established since at least 1995 that public employees have a right to be free from "[l]esser retaliation such as demotions, diminished responsibilities, or false accusations." *DeGuiseppe v. Vill. of Bellwood*, 68 F.3d 187, 192 (7th Cir. 1995).

Although courts "typically conduct qualified-immunity inquiries by focusing on the 'specific context in the case,' rather than on a 'broad general proposition,'" the Seventh Circuit has recognized that "general statements of the law are not inherently incapable of giving fair and clear warning, and in [certain] instances a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question." *Kristofek*, 832 F.3d at 798 (quoting first

*McGreal v. Ostrov*, 368 F.3d 657, 683 (7th Cir. 2004), and second *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

This is one such case where a general constitutional rule—that a government official may not retaliate against a public employee because the employee engaged in constitutionally protected speech—clearly proscribes Dr. Sebert's conduct. Based on more than a half century of case law, Dr. Sebert had clear notice that he could not retaliate against Ms. Tempel for engaging in protected speech by playing an integral role in her termination, publicly reprimanding Ms. Tempel for her criticism of the District, (Dkt. #1 ¶ 47), directing Ms. Thiede to investigate Ms. Tempel's speech, (Dkt. #1 ¶ 56), and recommending that the Board terminate Ms. Tempel's employment. (Dkt. #1 ¶ 61). Accordingly, Dr. Sebert is not entitled to qualified immunity.

In addition to the notice that general constitutional case law provided Dr. Sebert, he was also on clear notice that the specific instances of retaliation in which he engaged were unlawful in 2023.

**1. It was clearly established that it was unlawful for Dr. Sebert to engage in a campaign of harassment against Ms. Tempel because she engaged in constitutionally protected speech.**

In *Bart v. Telford*, the Seventh Circuit concluded that a campaign of harassment, "which included such things as baseless reprimands and '[h]olding her up to ridicule for bringing a birthday cake to the office on the occasion of the birthday of another employee although the practice was common and was especially favored in the case of supervisory personnel,'" amounted to a deprivation likely to deter speech. 677 F.2d 622, 624 (7th Cir. 1982); *see also Walsh v. Ward*, 991 F.2d 1344, 1345 (7th Cir. 1993) ("A campaign of petty harassment may achieve the same effect as an

explicit punishment.") (citing *Bart*); *see also Pieczynski v. Duffy*, 875 F.2d 1331, 1336 (7th Cir. 1989) ("[T]he principle that a campaign of petty harassments can violate the First Amendment (unless *de minimis*) was clearly stated in *Bart*, and should have placed these defendants on notice that false accusations and petty humiliations, if orchestrated into a campaign of political retaliation, are actionable.").

In this case, Dr. Sebert's campaign of harassment far exceeded the reprimand and ridicule that the plaintiff in *Bart* faced. Here, Dr. Sebert publicly reprimanded Ms. Tempel for her criticism of the District, (Dkt. #1 ¶ 47), directed Ms. Thiede to investigate Ms. Tempel's speech, (Dkt. #1 ¶ 56), and recommended that the Board terminate Ms. Tempel's employment. (Dkt. #1 ¶ 61). Given *Bart's* analysis of the breadth of public employee's First Amendment rights, it was clearly established that Dr. Sebert's conduct, taken as a whole, was unlawful.

**2. It was clearly established that it was unlawful for Dr. Sebert to publicly reprimand Ms. Tempel because she engaged in constitutionally protected speech.**

The holding in *Bart* also clearly establishes that Dr. Sebert's baseless public reprimand of Ms. Tempel was unlawful. *See Bart*, 677 F.2d at 624.

**3. It was clearly established that it was unlawful for Dr. Sebert to commission an investigation into Ms. Tempel because she engaged in constitutionally protected speech.**

In *Hobgood v. Ill. Gaming Bd.*, the Seventh Circuit concluded that "it was clearly established [by the mid-2000s] that the First Amendment prohibited investigating and then suspending and terminating a public employee because he had helped another employee pursue a lawsuit aimed at uncovering and proving public corruption" (i.e., constitutionally protected speech). 731 F.3d 635, 648 (7th Cir. 2013).

In this case, Dr. Sebert commissioned an investigation into Ms. Tempel because she engaged in constitutionally protected speech. (Dkt. #1 ¶ 56). The Seventh Circuit's conclusion in *Hobgood* shows that it has been clearly established since the mid-2000s, and at least since 2013, that such retaliatory investigations are unlawful.

### 4. It was clearly established that it was unlawful for Dr. Sebert to recommend that the Board terminate Ms. Tempel's employment because she engaged in constitutionally protected speech.

As mentioned above, for at least the last 55 years, public employees have had the right to be free from a retaliatory termination because they engaged in constitutionally protected speech.. *See Pickering*, 391 U.S. at 574. Dr. Sebert's integral role in Ms. Tempel's termination—he fulfilled his duties under Wisconsin law and District policy to recommend to the Board that Ms. Tempel be terminated—implicates him in Ms. Tempel's termination, (Dkt. #1 ¶ 60-61) and he was on clear notice that such a retaliatory termination was unlawful. Relatedly, since at least 2021, the Seventh Circuit has found that supervisors who recommend an employees' termination for unlawful reasons are not entitled to qualified immunity when the unlawful reasons have been clearly established. *See Taylor v. Ways*, 999 F.3d 478, 492 (7th Cir. 2021) (supervisor who recommended employees' termination because of employees' race is not entitled to qualified immunity even though supervisor did not make final termination decision); *see also Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) ("There is also precedent from five other circuits for imposing individual liability on the unlawfully motivated subordinate (the monkey, in the cat's paw fable) under § 1983."). Accordingly, it was clearly established that Dr. Sebert could not

recommend Ms. Tempel's termination because she engaged in constitutionally protected speech.

## CONCLUSION

For the reasons stated above, the Complaint states First Amendment retaliation claims against the District and Dr. Sebert, and Dr. Sebert is not entitled to qualified immunity. Accordingly, the Court should deny Defendants' Motion to Dismiss.

Dated: November 17, 2023

s/ Summer H. Murshid
Summer H. Murshid, State Bar No. 1075404
Martha Burke, State Bar No 1121510
Connor J. Clegg State Bar No. 1118534

Hawks Quindel, S.C.
5150 North Port Washington Road, Suite 243
Milwaukee, WI 53217
Telephone: (414) 271-8650
Fax: (414) 207-6079
E-mail: smurshid@hq-law.com
mburke@hq-law.com
cclegg@hq-law.com

Attorneys for Plaintiff
