UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MELISSA TEMPEL,

    Plaintiff,

    v.                                                  Case No. 23-CV-1169

SCHOOL DISTRICT OF WAUKESHA and
JAMES SEBERT,

    Defendants.

---

### DECISION AND ORDER ON DEFENDANTS' MOTION TO DISMISS

---

Melissa Tempel, a former first grade teacher for Heyer Elementary School in Waukesha, Wisconsin, sues the School District of Waukesha (the "District") and Superintendent of Schools Dr. James Sebert (collectively "Defendants") for allegedly terminating her employment in retaliation for exercising her First Amendment rights, in violation of 42 U.S.C. § 1983. Defendants move to dismiss Tempel's complaint on the grounds that it fails to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons that follow, Defendants' motion to dismiss is denied.

## BACKGROUND

Tempel began her employment with the District in 2018 and was employed as a first grade dual-language educator at Heyer Elementary School. (Compl. ¶ 7, Docket # 1.) The District has a Board Policy entitled "Controversial Issues in the Classroom" ("Board Policy 2240"), which states, in relevant part:

> The Board believes that the consideration of controversial issues has a legitimate place in the instructional program of the District.

Properly introduced and conducted, the consideration of such issues can help students learn to identify important issues, explore fully and fairly all sides of an issue, weigh carefully the values and factors involved, and develop techniques for formulating and evaluating positions.

For purposes of this policy, a controversial issue is a topic

    A.    on which opposing points of view have been promulgated by responsible opinion.
    B.    Which may be the subject of intense public argument, disagreement or disapproval
    C.    Which may have political, social or personal impacts on students and/or the community, and
    D.    Which is likely to arouse both support and opposition in the community.

The Board will permit the introduction of controversial issues when use in the instructional program:

    A.    is related to the instructional goals of the course of study
    B.    is appropriate for the age and maturity level of the students engaged in the discussion.
    C.    does not tend to indoctrinate or persuade students to a particular point of view;
    D.    encourages open-mindedness and is conducted in a spirit of scholarly inquiry;
    E.    does not cause a substantial disruption in the school environment.
    F.    does not create a hostile school environment.

(*Id.* ¶ 9.) In August 2021, Dr. Sebert announced that Board Policy 2240 would apply to ban Black Lives Matter, Blue Lives Matter, Thin Blue Line, anti-racist, and other materials. (*Id.* ¶ 10.) Teachers were asked to remove all such materials from their classrooms. (*Id.*) The District's implementation of this policy garnered press attention and was the subject of discussion at the September 15, 2021 Board meeting. (*Id.* ¶ 11.) Over the 2021-2022 school year, Board Policy 2240 was applied by the District to ban LGBTQ+ Pride flags, safe space signs, and displays of the District's Nondiscrimination and Access to Equal Educational

Opportunity Policy ("Board Policy 2260"). (*Id.* ¶ 12.) The policy was also applied to signs that stated, "This classroom is anti-racist" and "This school welcomes you." (*Id.*)

Since Board Policy 2240 was implemented, the District was featured in the press no less than 20 times in 2021 and 2022. (*Id.* ¶ 15.) On September 30, 2021, a Change.org petition was started calling on the District to rescind signage bans and discriminatory restrictions and follow policies and procedures that demonstrate a commitment to equity; 4,590 signatures have been added to this petition as of the date this complaint was filed. (*Id.* ¶ 16.) On October 14, 2021, the press reported on attendance at the October Board meeting, including comments by 35 parents, relating to the District's decision to apply Board Policy 2240 to remove signs supporting LGBTQ+ students. (*Id.* ¶ 17.) On October 27, 2021, 30 parents, students, teachers, and community members gathered to protest and deliver a letter to Dr. Sebert objecting to the application of Board Policy 2240 to remove pro-LGBTQ+ signs. (*Id.* ¶ 18.) The letter was signed by the Alliance for Education in Waukesha ("Alliance"), a parent/community group, along with 200 students, parents, teachers, professional staff, and community members. (*Id.*) The press also covered this October 27, 2021 gathering and documented concerns of increased bullying and harassment directed toward LGBTQ+ students within the District. (*Id.* ¶ 19.)

In November 2021, the press continued its coverage of the District's removal of safe space signs and LGBTQ+ Pride flags under Board Policy 2240. (*Id.* ¶ 21.) In December 2021, the District suspended a teacher without pay for pinning a Pride flag in her classroom and refusing to take it down. (*Id.* ¶ 22.) On January 7, 2022, the Alliance sent a Notification of Anticipated Actions & Statement of Remedial Intent to Dr. Sebert regarding the District's actions on equity, diversity, inclusion, and fairness and on March 25, 2022, the American

Civil Liberties Union ("ACLU") submitted a public records request to the District regarding its application of Board Policy 2240, to determine whether the District was violating constitutional or other civils rights of students and teachers by creating a hostile work environment for some groups of students. (*Id.* ¶¶ 23–24.) In June 2022, 54 teachers resigned from the District. Several of those teachers testified publicly at the June 2022 Board meeting that they were resigning because of the District's application of Board Policy 2240; specifically, the District's removal of LGBTQ+ signage and the monitoring of teachers who taught about race and diversity in their classrooms. (*Id.* ¶ 25.)

In early 2023, Heyer Elementary School planned to host a spring concert for kindergarten and first graders, in which students historically sing songs for their families and classmates. (*Id.* ¶ 29.) The elementary school's music teacher traditionally selects the songs that the students will sing at the spring concert. (*Id.* ¶ 30.) The music teacher selected the song "Rainbowland" by Miley Cyrus and Dolly Parton for the 2023 spring concert. (*Id.* ¶ 31.) The music teacher notified Heyer Principal Mark Schneider of the teacher's selection of "Rainbowland" for the 2023 spring concert. (*Id.* ¶ 32.) On March 21, 2023, the District advised the music teacher that the singing of "Rainbowland" by Miley Cyrus and Dolly Parton at the 2023 Heyer spring concert was prohibited. (*Id.* ¶ 33.) The same day, Tempel received an email from the music teacher advising her that the District would not allow "Rainbowland" to be performed at the 2023 Heyer spring concert. (*Id.* ¶ 34.)

Tempel has a personal account on the social media platform "X," formerly known as Twitter, with the handle @melissatempel. (*Id.* ¶ 35.) On March 21, 2023 at 6:39 p.m., Tempel tweeted the following:



(*Id.* ¶ 40.) In the days following, Tempel's tweet gained national attention with news outlets across the country reporting on the District's decision to prohibit the singing of "Rainbowland." (*Id.* ¶ 41.) On March 24, 2023, the District issued a public statement to the media, advising that the Principal of Heyer and a central office administrator had reviewed the song alongside Board Policy 2240. (*Id.* ¶ 42.) The statement explained that the Principal and the central office administrator determined that "Rainbowland" could be deemed controversial in accordance with Board Policy 2240. (*Id.*)

During spring break while school was not in session, Tempel was interviewed by news outlets regarding the District's "Rainbowland" decision, the application of Board Policy 2240, and other related issues. (*Id.* ¶ 44.) Between March 22, 2023, and March 31, 2023, news outlets also interviewed parents, community members, and Alliance for Waukesha members about the District's decision regarding "Rainbowland," the application of Board Policy 2240, and other related issues. (*Id.* ¶ 45.) On March 31, 2023, Dr. Sebert

and Board President Kelly Piacsek issued a statement to School District of Waukesha "Stakeholders" again advising that the Principal of Heyer and a central office administrator reviewed "Rainbowland" relative to Board Policy 2240 and determined it would be prohibited. (*Id.* ¶ 47.) The statement also announced that the matter should have been handled differently by Tempel and that steps were being taken to address how Tempel had chosen to address Heyer Elementary's prohibition of "Rainbowland" during the spring 2023 concert. (*Id.*)

When Tempel returned to work after spring break on April 3, 2023, she was informed that she was being placed on administrative leave effective immediately. (*Id.* ¶ 49.) Tempel's administrative leave garnered national attention. (*Id.* ¶ 53.) Dozens attended the April 12, 2003 Board meeting to discuss the "Rainbowland" decision and a rally and sing-a-long were held in support of Tempel. (*Id.*) Both events were covered by the press. (*Id.*) Between April 3, 2023, and May 10, 2023, Human Resources investigated Tempel's conduct, and on May 10, the investigation concluded that Tempel violated Page 7 of the Employee Handbook for Professional Staff Members, Board Policy 3179 (Employee Concerns), Board Policy 3213 (Student Supervision and Welfare), and Board Policy 3310 (Employee Expressions in Non-Instructional Settings). (*Id.* ¶¶ 56–60.) In a letter dated May 15, 2023, Dr. Sebert informed Tempel that he would be recommending to the Board that Tempel's employment be terminated. (*Id.* ¶¶ 60–61.) Tempel requested a hearing to petition the Board to reject Dr. Sebert's recommendation. (*Id.* ¶ 62.) The Board held a hearing on July 12, 2023, and voted unanimously to adopt Dr. Sebert's recommendation. (*Id.* ¶ 64.) Tempel's employment was terminated effective July 12, 2023. (*Id.*)

Tempel sues the District and Dr. Sebert, alleging that her employment was terminated in retaliation for exercising her First Amendment rights. (*Id.* ¶¶ 65–82.)

## STANDARD OF REVIEW

A motion to dismiss under Fed. R. Civ. P. 12(b)(6) challenges the sufficiency of the complaint on the basis that the plaintiff has failed to state a claim upon which relief can be granted. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The Supreme Court has interpreted this language to require that the plaintiff plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Ashcroft v. Iqbal*, the Supreme Court elaborated further on the pleadings standard, explaining that a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," though this "standard is not akin to a 'probability requirement.'" 556 U.S. 662, 678 (2009). The allegations in the complaint "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When determining the sufficiency of a complaint, the court should engage in a two-part analysis. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). First, the court must "accept the well-pleaded facts in the complaint as true" while separating out "legal conclusions and conclusory allegations merely reciting the elements of the claim." *Id.* (citing *Iqbal*, 556 U.S. at 680). Next, "[a]fter excising the allegations not entitled to the presumption [of truth], [the court must] determine whether the remaining factual allegations 'plausibly suggest an entitlement to relief.'" *Id.* (citing *Iqbal*, 556 U.S. at 681). As explained in *Iqbal*, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a

context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679. All factual allegations and any reasonable inferences must be construed in the light most favorable to the nonmoving party. *Price v. Bd. of Educ. of City of Chicago*, 755 F.3d 605, 607 (7th Cir. 2014).

## ANALYSIS

Tempel alleges that Defendants terminated her employment in retaliation for exercising her First Amendment rights. Defendants argue that Tempel's complaint fails to plead sufficient facts to support a First Amendment retaliation claim. Defendants further argue that Tempel's complaint against Dr. Sebert in his individual capacity fails because Dr. Sebert did not act under color of state law, there is no causal connection between Dr. Sebert and the termination action, and Dr. Sebert is entitled to qualified immunity. I will address each argument in turn.

1.  *First Amendment Retaliation Claim*

The First Amendment, applicable to the states through the Fourteenth Amendment, prohibits a public employer from retaliating against an employee for engaging in protected speech. *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). To assert a First Amendment retaliation claim under 42 U.S.C. § 1983, the plaintiff must allege that: (1) she engaged in activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was "at least a motivating factor" in the defendants' decision to take the retaliatory action. *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). Defendants do not contend that Tempel has insufficiently pled the second element; thus, I focus on whether Tempel's complaint sufficiently alleges elements one and three.

### 1.1 Protected Speech

Defendants argue that Tempel fails to sufficiently allege that she engaged in protected speech. For a public employee's speech to be protected under the First Amendment, the employee must show that: (1) she made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) her interest in expressing that speech was not outweighed by the state's interests as an employer in "promoting effective and efficient public service." *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (internal quotation and citation omitted). This last element is known as *Pickering* balancing, after *Pickering v. Board of Education*, 391 U.S. 563 (1968). *Id.*

#### 1.1.1 Speaking as a Private Citizen or Public Employee

Defendants argue that Tempel pleads insufficient facts demonstrating that she was speaking as a private citizen, stating that she merely pleads conclusory legal assertions. (Docket # 7 at 9.) Defendants argue that Tempel intentionally omitted her Twitter username from her Complaint—"Maestra Melissa"—with "maestra" meaning "teacher" in Spanish. (*Id.*) They argue that in the tweet, Tempel refers to "my first graders" and tags and identifies the District. (*Id.*)

However, "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 239–40 (2014). Tempel's complaint sufficiently alleges that she was speaking as a private citizen. She alleges that while employed by the District, she did not use her personal Twitter account or any other social media account in the course of her official

9

duties as a District employee. (Compl. ¶¶ 38–39.) Tempel alleges that the tweet in question was sent at 6:39 p.m., after school hours. (*Id.* ¶ 40.) Tempel alleges that interviews she gave to news outlets regarding the "Rainbowland" decision were conducted off District premises and during her personal, off-duty time, including during the District's spring break from March 27 through March 31, 2023. (*Id.* ¶¶ 43–45.) Defendants do not contend that Tempel created the Twitter account at the behest of the District, nor do they assert that the District controlled or directed Tempel's use of the Twitter account or her interviews with the media. Accordingly, the complaint sufficiently alleges that the speech in question was not ordinarily within the scope of Tempel's duties but was done during non-work hours on her own initiative. That the speech in question concerns Tempel's duties as a teacher does not automatically transform it into non-citizen speech. Thus, dismissal is not appropriate on this ground.

### 1.1.2 Speaking on a Matter of Public Concern

Defendants also argue that Tempel's speech did not address a matter of public concern. Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Gustafson v. Jones*, 290 F.3d 895, 906–07 (7th Cir. 2002) (internal citation omitted). Of the three factors, content is most important. *Id.* The "public concern" element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee. *Id.* Defendants argue that Tempel's alleged speech "must be considered as relating to classic workplace issues," i.e., that Tempel was upset that a song she wanted to be sung was

disallowed by the District. (Docket # 7 at 10.) Defendants assert that this issue was unique to Tempel and concerned her own self-interest within her employment. (*Id.*)

Defendants' position is difficult to reconcile with the actual allegations of the complaint. Tempel alleges that the District's application of Board Policy 2240 received frequent attention in the press, precipitated the creation of a Change.org petition signed by over 4,000 people, garnered increased attendance and press coverage of school board meetings addressing the removal of pro-LGBTQ+ signs, caused the public to gather in protest, and evoked the involvement of the ACLU, amongst other allegations. (Compl. ¶¶ 11, 15–19, 21, 24–26.) "Although . . . intense public interest . . . is not dispositive or necessary to demonstrate public concern, where the public takes . . . an active interest in the matter it is hard to argue that the speech was purely private." *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997) (internal quotation and citation omitted). The complaint sufficiently alleges that this issue was not unique to Tempel, and the facts, as pled, do not indicate that the situation was simply a personal gripe between employer and employee. For these reasons, Tempel's complaint sufficiently alleges that she engaged in activity protected by the First Amendment.

### 1.1.3 *Pickering* Balancing Test

Defendants further argue that even if Tempel pled sufficient facts to support that she engaged in constitutionally protected speech, she failed to plead facts sufficient to show that her interest in speaking on the song choice outweighed the District's interest in providing effective and efficient education services. (Docket # 7 at 11–12.) In *Pickering*, the Supreme Court explained that teachers may not constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public

interest in connection with the operation of the public schools in which they work. 391 U.S. at 568. However, the Court also stated that the State, as an employer, does have an interest in regulating the speech of its employees "that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Id.* The Court explained that the "problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* The *Pickering* balancing test includes such factors as: (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public. *Bonds v. Milwaukee Cnty.*, 207 F.3d 969, 981 (7th Cir. 2000).

Given the need to weigh these various factors, the Seventh Circuit has found that the *Pickering* inquiry, "can seldom be done on the basis of the pleadings alone." *Delgado v. Jones*, 282 F.3d 511, 517 (7th Cir. 2002). In fact, in *Gustafson v. Jones*, 117 F.3d 1015 (7th Cir. 1997), the court said that it "would be a rare case indeed where the pleadings as a whole would permit judgment as a matter of law on this point, unless the plaintiff was relying on speech that is wholly unprotected by the First Amendment or the defendant's justifications were frivolous." *Id.* at 1019. Thus, the court found that, normally, "application of the

*Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery." *Id.*

Defendants argue for analysis of the *Pickering* factors on the basis of the pleadings alone and to consider additional documents outside of the pleadings, namely, the Investigation Report and Dr. Sebert's recommendation letter to terminate Tempel's employment, in doing so. (Docket # 7 at 11–12.) They argue that because these documents are central to Tempel's claim and are partially quoted in her complaint, they may be considered on a motion to dismiss without converting the motion to one of summary judgment. (*Id.*) However, even if I were to consider the additional documents provided by Defendants, they merely illustrate why it is improper to weigh the *Pickering* factors at this juncture. For example, while the District contends that its internal investigation report shows that Tempel's tweet caused substantial disruption at school, this is, of course, the District's position. Tempel views the situation differently. Tempel alleges that the dispute arose in the context of tremendous public disapproval of Board Policy 2240 and how it affected LGBTQ+ students. (Compl. ¶¶ 16–28.) She alleges that the District failed to report an incident of harassment towards an LGBTQ+ student and that students were articulating that the District's policies made them feel unwanted and scared. (*Id.* ¶¶ 20–21.) These are the precise facts and issues that will need to be fleshed out in discovery and presented to the Court for weighing at a later date. As such, dismissal is not appropriate at this juncture.

### 1.2 Motivating Factor

Defendants argue that Tempel's complaint fails to plead sufficient facts to support her conclusory allegation that the alleged First Amendment activity was a motivating factor in terminating her employment. (Docket # 7 at 13–14.) The causal connection element can

13

Case 2:23-cv-01169-NJ   Filed 12/20/23   Page 13 of 19   Document 14

be satisfied if a defendant sets in motion a series of events that he knew or reasonably should have known would cause the constitutional deprivation. *Conner v. Reinhard*, 847 F.2d 384, 397 (7th Cir. 1988).

The crux of Defendants' argument is that the recommendation letter, as cited in Tempel's complaint, unequivocally shows that Tempel was not terminated because of what she said, but because of the manner, method, and means by which she expressed her disagreement. (Docket # 13 at 7.) It is true that the letter, as quoted in the complaint, does indeed state that while Tempel was entitled to disagree with the decision, "the manner in which you chose to express your disagreement . . . was inappropriate, disruptive, and in violation of various District policies." (Compl. ¶ 60.) Tempel, however, alleges that the true reason underlying the termination decision was retaliation for exercising her First Amendment rights. (*Id.* ¶¶ 65–66.) Tempel alleges facts showing the investigation and termination recommendation came on the heels of the tweet at issue. (*Id.* ¶¶ 40– 41, 44, 47, 49–50, 60–61.) Thus, Tempel alleges sufficient facts, including the context and timing of her termination, to sufficiently allege that her First Amendment activity was a motivating factor in her termination. For these reasons, dismissal of Tempel's First Amendment retaliation claim is not warranted.

    2.    *First Amendment Retaliation Claim Against Dr. Sebert*

Defendants also challenge Tempel's complaint against Dr. Sebert in his individual capacity, arguing that the claim fails because Tempel: (1) cannot allege Dr. Sebert acted

14
Case 2:23-cv-01169-NJ   Filed 12/20/23   Page 14 of 19   Document 14

under color of state law; (2) cannot establish a causal connection between Dr. Sebert and the termination action[1]; and (3) Dr. Sebert is entitled to qualified immunity.

### 2.1 Acting Under Color of State Law

To succeed on a claim under § 1983, a defendant must be acting under color of state law. *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001). Not every action by a state official or employee is to be deemed as occurring "under color" of state law. *Hughes v. Meyer*, 880 F.2d 967, 971 (7th Cir. 1989). "Acting under color of state law" requires that the defendant in a § 1983 action "have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997) (internal quotation and citation omitted). A defendant acts under color of state law "when he abuses the position given to him by the State." *Id.* Thus, "acts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office." *Honaker*, 256 F.3d at 485.

Defendants argue that Dr. Sebert was not acting under color of state law because he did not take the official action terminating Tempel's employment; the final authority of whether to terminate an employee rests with the Board alone. (Docket # 13 at 8.) But whether one acts "under color of state law" simply requires that the defendant's actions be related to the performance of his duties. The complaint alleges that Dr. Sebert announced Board Policy 2240, that community members delivered a letter to Dr. Sebert objecting to the application of Board Policy 2240 to remove pro-LGBTQ+ signs, that Dr. Sebert co-drafted a

---

[1] Defendants raise an argument in Section II(C) of their brief under the heading "Third, the Facts as Alleged Do Not Properly Establish a First Amendment Retaliation Claim." (Docket # 7 at 20–21.) This section largely mirrors Defendants' previous arguments that Tempel's activity was not protected by the First Amendment and that the complaint fails to sufficiently allege the protected conduct was a motivating factor in the termination decision. (*Id.*) For the reasons already explained in this decision, I reject these arguments.

letter to the District reprimanding Tempel, that Dr. Sebert directed the District to investigate Tempel, and that Dr. Sebert wrote to Tempel informing her that he was adopting the findings and conclusions of the investigation report and was recommending to the Board that her employment be terminated. (Compl. ¶¶ 10, 18, 47, 56, 60–61.) The Board then voted to adopt Dr. Sebert's recommendation, resulting in Tempel's termination. (*Id.* ¶ 64.) Even if Dr. Sebert was not the final decisionmaker, he had authority to order an investigation of Tempel and offer a recommendation that was considered and adopted by the Board. It is therefore difficult to find that these facts as pled do not sufficiently demonstrate that Dr. Sebert's actions were related "in some way to the performance of the duties of the state office." *See Honaker*, 256 F.3d at 485. Dismissal is not warranted on this ground.

### 2.2 Causal Connection

Defendants also argue that Tempel insufficiently pleads that Dr. Sebert was personally responsible for the alleged deprivation of her constitutional rights. (Docket # 7 at 17–20.) Dr. Sebert is sued in his individual capacity, and to recover damages under § 1983, Tempel must establish Dr. Sebert's personal responsibility for the claimed deprivation of a constitutional right. *See Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982). A defendant's "direct participation"; however, is not required. *Id.* Rather, an "official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Id.*

Although Tempel alleges that Dr. Sebert's conduct was malicious or in reckless disregard of her First Amendment rights (Compl. ¶ 66), Defendants argue that the facts, as

pled, do not show conduct rising to the level of maliciousness or recklessness, but rather show reasonable actions (Docket # 7 at 18–20). Such argument is premature on a motion to dismiss; it should be raised either on summary judgment or at trial. I cannot find, as a matter of law, on the pleadings alone that Dr. Sebert's conduct was not deliberate or in reckless disregard of Tempel's rights and was in fact reasonable. And again, Tempel alleges multiple facts tying the alleged constitutional deprivation to Dr. Sebert's actions. (Compl. ¶¶ 10, 18, 47, 56, 60–61.) Dismissal is not warranted on this ground.

### 2.3 Qualified Immunity

Lastly, Defendants argue that Dr. Sebert is entitled to qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gill v. City of Milwaukee*, 850 F.3d 335, 340 (7th Cir. 2017) (internal quotations and citations omitted). To determine whether an official is entitled to qualified immunity, a court considers whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and whether that constitutional right was clearly established at the time of the alleged violation. *Id.*

The Seventh Circuit has stated that a Rule 12(b)(6) motion is not "always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim." *Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020). The court went on to state that "a complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred." *Id.* at 590 (internal quotation and

citation omitted). The court stated that "[u]ltimately, dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not state a claim of violation of clearly established law." *Id.*

Dismissal based on qualified immunity is not appropriate at this juncture. Tempel's complaint alleges a violation of a constitutional right and this right was clearly established at the time of Defendants' actions. *See Pickering*, 391 U.S. at 568 ("To the extent that the Illinois Supreme Court's opinion may be read to suggest that teachers may constitutionally be compelled to relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest in connection with the operation of the public schools in which they work, it proceeds on a premise that has been unequivocally rejected in numerous prior decisions of this Court."). For this reason, dismissal is not appropriate based on qualified immunity at this time. *See Hanson*, 967 F.3d at 590 ("The district court concluded that the plaintiffs stated a claim for a violation of a clearly established right, barring qualified immunity at this point in the litigation.").

## CONCLUSION

Tempel alleges that the District and Dr. Sebert terminated her employment in retaliation for exercising her First Amendment rights. While Defendants argue that Tempel's complaint fails to state a claim for First Amendment retaliation and that the complaint fails as to the claim against Dr. Sebert, I find that Tempel's complaint sufficiently states a claim against both Defendants. Thus, dismissal is not warranted under Rule 12(b)(6). Defendants' motion is denied.

**ORDER**

**NOW, THEREFORE, IT IS ORDERED** that Defendants' Motion to Dismiss (Docket # 6) is **DENIED**.

Dated at Milwaukee, Wisconsin this 20th day of December, 2023.

BY THE COURT

_____
NANCY JOSEPH
United States Magistrate Judge