MELISSA TEMPEL,

             Ms. Tempel,                        Case No.: 2:23-CV-01169

    v.

SCHOOL DISTRICT OF WAUKESHA,

and

JAMES SEBERT,

             Defendants.

**DEFENDANTS' BRIEF IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The decision by a local grade school not to use the song Rainbowland by Miley Cyrus and Dolly Parton in its annual spring concert is not a matter of public concern. So when a teacher at said local grade school takes to social media to air her personal grievance regarding a decision made by her school administration, she is not engaging in constitutionally protected speech. Furthermore, said teacher is not speaking as a private citizen when she uses the Twitter handle "Maestra (Teacher) Melissa"; makes reference to "My first graders," "our spring concert", and the decision by "our administration"; and includes "@waukeshaschools" in the post. And, in this case, Melissa Tempel made it abundantly clear she was posting as a teacher when she testified under oath as follows: "I'm always a teacher, so when I'm speaking on a personal – giving personal -- my personal perspective, it's still as a teacher."

Ms. Tempel now tries to justify her actions by claiming she was speaking on a matter of public concern; to wit: the District's use of a Controversial Issues Policy to ban the singing of a

song about rainbows. However, Ms. Tempel herself fabricated the entire controversy. The principal's decision had nothing to do with rainbows, and instead was based upon his concern as to whether Miley Cyrus was an appropriate role model for first grade students. Through reckless disregard for the truth, failure to verify her claims, false assumptions, and plain untruths, Ms. Tempel created the entire controversy she claims to be a matter of public concern. Ms. Tempel fabricated a narrative about the District's war on rainbows. She then doubled down on that narrative and made wholly untrue statements regarding the District's actions and decisions. Her false statements and/or reckless disregard for the truth lead to threats of violence against the District and a substantial disruption in the District's operations. Ms. Tempel cannot now hide behind the First Amendment with a fabricated matter of public concern forged from what was really a personal grievance over a decision made by the District's administration.

Ms. Tempel alleges Defendants retaliated against her for her posts on Twitter and speaking to news outlets, but the undisputed evidence in this case shows Ms. Tempel's speech was not constitutionally protected, and her actions disrupted the school environment, undermined employee harmony, and led to heightened security risks—all of which are vital interests for the District in providing effective and efficient education. Consequently, Ms. Tempel's speech does not warrant First Amendment protection.

In light of the consequences of Ms. Tempel's actions, the District and Dr. Sebert (in his official capacity) took needed and measured steps to address the safety concerns and disruption. The undisputed facts show Dr. Sebert did not terminate Ms. Tempel's employment with the District (as this was solely within the authority of the Board of Education), making her First Amendment claims against him in his individual capacity fatally flawed from the outset. Even if the claim against him was viable, Dr. Sebert is entitled to qualified immunity.

Ultimately, Ms. Tempel cannot prove the necessary elements to prevail on her First Amendment claim against either the District or Dr. Sebert. Accordingly, Defendants now move for summary judgment and ask this Court to dismiss Ms. Tempel's lawsuit against Defendants in its entirety and with prejudice.

## STATEMENT OF FACTS

All material facts are set forth in the Defendants' Joint Proposed Findings of Fact and all documents referenced therein have been filed with the Court.

## LEGAL STANDARD

Summary judgment is properly granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). When determining whether a genuine issue of material fact exists, the court considers evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). Material facts are facts that "might affect the outcome of the suit" under the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986).

A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, Inc.*, 477 U.S. at 248. The court shall grant summary judgment if "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

3

<u>**ARGUMENT**</u>

I.  **Ms. Tempel Cannot Establish A Prima Facie Case Of First Amendment Retaliation; Therefore, The Court Should Grant Summary Judgment In Favor Of Defendants.**

The sole cause of action in Ms. Tempel's Complaint alleges First Amendment retaliation under 42 U.S.C. § 1983. [Dkt. #1]. To establish a prima facie claim for First Amendment retaliation, a plaintiff must satisfy three essential elements: (1) she engaged in an activity protected by the First Amendment; (2) she suffered a deprivation that would likely deter First Amendment activity in the future; and (3) there exists a causal connection between the constitutionally protected conduct and the retaliatory action. *Watkins v. Kasper*, 599 F.3d 791, 794 (7th Cir. 2010). An employee may rely on circumstantial evidence to establish a prima facie case, like suspicious timing and other similarly situated employees who were treated more favorably. *Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 672 (7th Cir. 2009).

If an employee establishes a prima facie case of retaliation, the burden then shifts to the employer to show the same actions would have occurred absent the protected speech. *Id.* at 674; *Spiegla v. Hull*, 371 F.3d 928, 942–43 (7th Cir. 2004). If the employer demonstrates the action would have occurred regardless of the protected speech, the burden shifts back to the employee to show the employer's explanation is a pretext for retaliation. *Id.*

Ms. Tempel cannot establish a prima facie case. First, her speech is not protected under the First Amendment. And second, she cannot establish her speech was a motivating factor in her termination. Consequently, Defendants respectfully request the Court grant their motion for summary judgment.

4

## A.    Ms. Tempel's Speech Was Not Protected Under The First Amendment.

It is well settled, a citizen who accepts public employment "must accept certain limitations on his or her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Government employers enjoy considerable discretion to manage their operations, and the First Amendment "does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick v. Myers*, 461 U.S. 138, 149, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). A public employee's speech is constitutionally protected by the First Amendment "*only* when [s]he speaks 'as a citizen' on matters of public concern." *Roake v. Forest Preserve District of Cook County*, 849 F.3d 342, 346 (7th Cir. 2017) (emphasis added). If she speaks "pursuant to [her] official duties," *id*. (alteration omitted), or simply out of "pure personal interest," *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 794 (7th Cir. 2016), the speech is not protected. The exclusion of employee speech from the First Amendment is not limited to ordinary duties or formal job description speech. *Fehlman v. Mankowski*, 74 F.4th at 875; *Kubiak v. City of Chicago*, 810 F.3d 476, 481 (7th Cir. 2016). Instead, the limitation is inclusive of speech falling with the "general ambit" of their position. *Fairley v. Andrews*, 578 F.3d 518, 523 (7th Cir. 2009).

In the public employment context, however, if speech addresses a matter of public concern, a governmental employer may impose certain restraints if "the interest of the employee as a citizen in commenting on the matter is outweighed by the interest of the governmental employer in promoting effective and efficient public service." *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006); *McGreal v. Ostrov,* 368 F.3d 657, 675-76 (7th Cir. 2004). This is because:

> [g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little

chance for the efficient provision of public services. Public employees, moreover, often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions.

*Garcetti,* 547 U.S. at 418-19.

Thus, for First Amendment protections to attach to Ms. Tempel's speech as a governmental employee, the evidence must demonstrate her speech (1) is made as a private citizen, (2) addresses a matter of public concern, and (3) her interest in speech does not outweigh the state's interest as an employer in "promoting effective and efficient public service." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). The undisputed facts do not support such a finding. Ms. Tempel's social media posts and media interviews were made in her capacity as a first-grade teacher for the District, were rooted in a personal grievance regarding a decision affecting her classroom, and resulted in substantial disruption, thus impairing the District's ability to provide effective and efficient public service.

1. **Ms. Tempel was speaking as a teacher in the Waukesha School District and not a private citizen as required for her speech to be protected under the First Amendment.**

Ms. Tempel took numerous steps to identify herself as a teacher in the Waukesha School District when she posted on social media and spoke during interviews.

On March 21, 2023, Ms. Tempel Tweeted:

6



[Defs' PFOF, ¶16].

The Court need look no further than Ms. Tempel's own words to understand the essence of this case.

In her first Tweet, posted under the name "Maestra Melissa"[1] and tagging the District, Ms. Tempel wrote: "*My* first graders were so excited to sing Rainbowland for *our* spring concert but it has been vetoed by *our* administration." [Defs' PFOF, ¶16]. By tagging the District and using possessive determiners to refer to "my first graders," Ms. Tempel unquestionably identified herself as a first-grade teacher employed by the District.

During her deposition, when asked to whom she was referring in this text message, Ms. Tempel responded, "I was referring to the students that I teach in the School District of Waukesha." [Dkt. #48, Tempel Tr., 100:19-25]. When asked to identify the spring concert location, she

---

[1] "Maestra" is a Spanish word commonly used to describe a female teacher.

responded, "At Heyer Elementary School." [Dkt. #48, Tempel Tr., 101:1-5]. When asked why she included "@waukeshaschools" in her tweet, Ms. Tempel testified it was because she wanted the public to know what was happening in her first grade classroom in the Waukesha School District. [Dkt. #48, Tempel Tr., 106:3-7].

Ms. Tempel's post did not merely express a general viewpoint—it publicly disclosed an internal administrative decision affecting her classroom, framing it as a grievance against her employer. The content of her post is inseparable from her official duties as the teacher engaged in organizing the spring concert for first graders at Heyer Elementary School. To argue otherwise defies both the plain meaning of her words and common sense.

When public employees speak pursuant to their official duties, their speech is not entitled to First Amendment protections, regardless of whether the speech concerns a matter of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). The *Garcetti* Court recognized the need for public employers to have discretion in controlling their operations:

> Employers have heightened interests in controlling speech made by an employee in his or her professional capacity. Official communications have official consequences, creating a need for substantive consistency and clarity. Supervisors must ensure that their employees' official communications are accurate, demonstrate sound judgment, and promote the employer's mission.

*Id.* at 422-23. Public employee speech "ordinarily within the scope of [the] employee's duties" is therefore not afforded First Amendment protection. *Lane v. Franks*, 573 U.S. 228, 134 S. Ct. 236, 2379, 189 L. Ed. 2d 312 (2014).

As highlighted above, Ms. Tempel's claim that she used her Twitter account "to speak as a private citizen" [Dkt. #1, ¶39], is overwhelmingly contradicted by the evidence. To start, her account name, "Maestra Melissa" (i.e., "Teacher"), explicitly identifies her as an educator. [Defs'

8

PFOF, ¶16; Dkt. #48, Tempel Tr. 100:12–17]. Moreover, she repeatedly tagged the District's official account, @waukeshaschools, in posts regarding the "Rainbowland" decision affecting her classroom—further reinforcing her role as a District employee publicly disputing an internal decision. [Defs' PFOF, ¶¶ 18-19].

During her termination hearing before the Waukesha School District Board of Education, Ms. Tempel made it abundantly clear that when she spoke about these matters, she was doing so as a teacher. Ms. Tempel provided the following sworn testimony at that hearing:

> So I'm -- I mean I'm a teacher, right, so I've been a teacher for more than half my life. When I'm at work from, like, eight to four during the school year, I'm a teacher at Heyer Elementary. But when I leave work, I'm still a teacher. I'm not ending my job as a teacher just because I leave the building. When I'm out and about like at the grocery store or something, if I see a student, a former student, whether it's an adult or a child and they call my name, like, I'm always their teacher and they're always my student, even if they were an adult.
>
> . . .
>
> And I -- I'm a teacher, I'm always a · teacher, right.· So when we're talking to the public, I have students from multiple different cities and different ages all over the place.
>
> . . .
>
> **I'm always a teacher, so when I'm speaking on a personal – giving personal -- my personal perspective, _it's still as a teacher_.**

[Dkt. #31, Tempel Tr., 98:2 – 99:15] (Emphasis added).

During her deposition, this testimony was presented to Ms. Tempel as Ms. Tempel was questioned regarding whether she was posting her comments as a private citizen or as a teacher for the District. Ms. Tempel was directly asked whether she wished to modify, explain, and/or rescind her prior testimony. She stated she did not wish to do so. [Dkt. #48, Tempel Tr., 99:18-24].

Ms. Tempel now attempts to persuade this Court to accept the flawed premise that because she never explicitly stated she was a "teacher with the District," she must have been speaking as a private citizen. This argument is unavailing. Her account name, "Maestra Melissa," her use of

possessive determiners when referring to "my" students, and her repeated tagging of the District's official account, @waukeshaschools, leave no doubt that she was speaking in her capacity as a District teacher. No reasonable reader would interpret her statements as those of a private citizen engaging in public discourse; rather, they are unmistakably the words of an employee publicly challenging an internal administrative decision.

Despite her attempts to distance herself from her role as a District teacher in this case, Ms. Tempel's own words contradict her argument. Her posts repeatedly reference "my first graders," "our spring concert," and "vetoed by our administration," making it unmistakably clear she was speaking as a teacher for the District and tying her speech directly to her official position." In her sworn testimony during her hearing before the Board of Education, Ms. Tempel made it abundantly clear she was speaking as a teacher during her social media posts and during her interviews. [Dkt. #31, Tempel Tr., 98:2 – 99:15]. During her deposition, Ms. Tempel doubled-down on that position and reiterated her speech was that as a teacher in the Waukesha School District at all times relevant to this case. Consequently, Ms. Tempel's speech was not made as a private citizen. Instead, her posts fall within the ambit of her employment and does not warrant protection under the First Amendment.

>    **2.    Ms. Tempel was merely airing a purely personal grievance and not speaking on a matter of public concern as required for speech to be protected under the First Amendment.**

Even if Ms. Tempel were speaking as a private citizen, her claim still fails because her speech was driven by a personal grievance, not a matter of public concern. If a public employee speaks "upon matters only of personal interest," the expression of that speech and any alleged retaliation against the speaker is not a matter appropriately reviewed by federal courts. *Connick v. Myers*, 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *see also Marshall v. Allen*, 984

F.2d 787, 795 (7th Cir.1993). Put differently, speech merely implicating a "purely personal grievance" is *not* protected speech under the First Amendment. *Sullivan v. Ramirez*, 360 F.3d 692, 699 (7th Cir. 2004) (emphasis added). As such, "[p]ersonal grievances, complaints about conditions of employment, or expressions about other matters of personal interest" do not constitute speech about matters of public concern that are protected by the First Amendment, but are matters more immediately concerned with the self-interest of the speaker as employee. *Connick*, 461 U.S. at 147. The Court in *Connick* explained the limits of First Amendment protections in the employment context*:*

> While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs.

*Id*. at 149, 103 S.Ct. at 1691.

Ms. Tempel's speech falls squarely within this limitation. Her grievance was rooted in a routine workplace dispute—her dissatisfaction with an administrative decision regarding the selection of songs for her first-grade class's spring concert. This issue was entirely personal to Ms. Tempel, tied to her specific classroom, and concerned only her own self-interest as an employee.

The undisputed facts show, in her various posts and interviews with news outlets, Ms. Tempel again and again expressed her grievances using possessive determiners, such as references to "my students" and her classroom of "24" students:

11



**Maestra Melissa** @melissatempel · Apr 1

"If my students see this, I really hope that they see that even if you're just a teacher, you can speak out and your voice can be heard." @ellienw_news @waukeshaschools @MileyCyrus @DollyParton @OrenYoel

cbs58.com
'Let the kids sing': Miley Cyrus producer, foundation reacts to "Rainb... WAUKESHA, Wis. (CBS 58) -- After being thrust into both local and national spotlights following a decision to ban first-graders from ...

♡ 2     ⇄ 7     ♡ 43     ᴵˡˡ 2,045     ⬆



♡ 444     ⇄ 1,007     ♡ 1,902     ᴵˡˡ 221.1K     ⬆

**Karen Pilarski** @KarenPilarski · Mar 22
Are you a teacher in Waukesha? What school was supposed to sing it and what was the reason given?

♡ 9     ⇄ 5     ♡ 42     ᴵˡˡ 10K     ⬆

**Maestra Melissa**
@melissatempel

Heyer Elementary. No reason given.

7:13 PM · Mar 22, 2023 · **9,108** Views

**12** Retweets     **113** Likes

**Maestra Melissa** @melissatempel · Mar 25
Replying to @rustedrosepetal
We are trying to get this ban removed and my school is not the appropriate target. Also, doxxing is not cool.

♡     ⇄     ♡     ᴵˡˡ 122     ⬆

♡ 444     ⇄ 1,007     ♡ 1,903     ᴵˡˡ 221.1K     ⬆

**Melissa D** @MelissaMBrewers · Mar 23
How many students are in your class?

♡ 1     ⇄ 1     ♡ 6     ᴵˡˡ 5,579     ⬆

**Maestra Melissa**
@melissatempel

24 but there are about 65 first graders in total.

9:15 PM · Mar 23, 2023 · **5,382** Views

**1** Retweet     **24** Likes

♡     ⇄     ♡     🔖     ⬆

[Defs' PFOF, ¶18-19].

To conclude Ms. Tempel was speaking about anything other than her own grievance with the administration's decision regarding her classroom would defy common sense. Her speech was not directed at broader public policy concerns, systemic issues in education, or matters of importance to the community at large. Instead, it was a personal objection to an internal decision that affected only her and her students. Such personal grievances are not matters of public concern and, therefore, are not entitled to First Amendment protection.

### 3. Ms. Tempel created a false narrative regarding the District's war on rainbows, which she now claims is a matter of public concern.

Ms. Tempel claims she "spoke as a private citizen about a matter of public concern when she posted on social media and spoke to news outlets about the District's decision regarding 'Rainbowland'." [Dkt. #1, ¶73]. However, the undisputed evidence makes clear Ms. Tempel fabricated and misrepresented the District's actions and rationale for said actions. In other words, Ms. Tempel created a false narrative regarding the District's war on rainbows and then tried to use that false narrative to establish a matter of public concern, when in reality she was merely airing a personal grievance about a decision made by her school's administration. Various fabrications and/or false statements are identified below.

> i. *Fabrication 1: "My first graders were so excited to sing Rainbowland for our spring concert but it has been vetoed by our administration." [Dkt. #1, ¶40].*

During her deposition, Ms. Tempel admitted she had no actual evidence to support this assertion. Ms. Tempel admitted no one at the District used the word "veto". [Dkt. #48, Tempel Tr. 102:1-4]. No one at the District used the word "ban". [Dkt. #48, Tempel Tr. 102:6-8]. Ms. Tempel never spoke to Principal Schneider seeking an explanation for the reason Rainbowland

13

would not be sung at the concert. [Dkt. #48, Tempel Tr. 102:9-25]. In fact, Ms. Tempel expressly admitted she made this post based purely on her own assumptions, without having any factual support. [Dkt. #48, Tempel Tr. 104:13-16].

               ii.    *Fabrication 2: "The song Rainbow Connection from the Muppet Movie has also been taken off our spring concert list." [Defs' PFOF ¶18].*

During her deposition, Ms. Tempel admitted she had no actual evidence to support this assertion. While she claimed Jared Ziegler verbally made this statement to her, Ms. Tempel was forced to admit Mr. Ziegler did not testify during the hearing before the School Board and Mr. Ziegler has not provided any sworn statement substantiating this claim. [Dkt. #48, Tempel Tr. 110:7-13]. Again, Ms. Tempel admitted she never spoke with Principal Schneider, with Superintendent Sebert, or with anyone in administration to obtain any information to verify this false assertion. [Dkt. #48, Tempel Tr. 110:14 – 111:3].

               iii.    *Fabrication 3: "Today the banned Rainbow Connection, so it seems the reason is rainbows". [Defs' PFOF ¶19].*

During her deposition, Ms. Tempel admitted she had no actual evidence to support this assertion. Ms. Tempel admitted no one from the District used the word "banned". [Dkt. #48, Tempel Tr. 111:14-15]. Ms. Tempel admitted she never spoke with anyone in administration to obtain any information to verify this false assertion. [Dkt. #48, Tempel Tr. 111:16 – 112:2]. Once again, Ms. Tempel admitted she had no actual evidence to support this assertion and, instead, purely made an assumption. [Dkt. #48, Tempel Tr. 112:21-22]. Ms. Tempel also admitted she created the narrative that rainbows were the issue. [Dkt. #48, Tempel Tr. 112:23 – 113:1].

               iv.    *Fabrication 4: "Rainbow Connection was unbanned today after parents sent e-mail to admin." [Defs' PFOF ¶66].*

During her deposition, Ms. Tempel admitted no one at the District told her Rainbow Connection was "unbanned." [Dkt. #48, Tempel Tr. 114:20 – 115:4]. Furthermore, Ms. Tempel

14

admitted she did not have any direct knowledge regarding the truth of anything asserted in this specific post. [Dkt. #48, Tempel Tr. 115:5 – 117:13].

> v. *Fabrication 5: "They did ban Rainbow Connection, but then they unbanned it." [Dkt. #67, Aziere Decl. ¶13, Ex. K].*

During her deposition, Ms. Tempel admitted to sending this Tweet on March 26, 2023. [Dkt. #48, Tempel Tr. 127:21-24]. By this point, Ms. Tempel was aware the decision not to sing Rainbowland was based on concerns whether the artist (i.e., Miley Cyrus) was appropriate for first grade students, and not the lyrics. [Dkt. #48, Tempel Tr. 122:18 – 123:23]. Despite this, Ms. Tempel admitted she took no steps to ascertain the basis for any decision by the District and still had no evidence Rainbow Connection had ever been banned. [Dkt. #48, Tempel Tr. 128:3-17].

Ms. Tempel's deposition testimony makes clear she created the narrative regarding the District's opposition to rainbows. At best, Ms. Tempel exhibited a reckless disregard for the truth when she created this narrative. At worst, Ms. Tempel flat out lied. In either case, Ms. Tempel forged a false narrative out of a personal workplace grievance. Ms. Tempel cannot now claim to have been speaking on a matter of public concern when that matter was of her own creation, real only in her own mind.

> **4.** **Ms. Tempel's speech is not protected under the First Amendment because the District's interest in promoting efficiency of the public service it performs outweigh Ms. Tempel's interest in free speech.**

As stated *supra*, the record in this case does not, by preponderance of the evidence, support Ms. Tempel was speaking as a "private citizen" on a "matter of public concern." Even assuming, arguendo, her speech was protected under the First Amendment, her claim still fails under the *Pickering* balancing test because her interest in commenting on song selection is outweighed by the District's compelling interest in maintaining an effective and efficient educational environment.

When a public employee is terminated for engaging in speech, courts must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). The Supreme Court has made clear that this balance is necessary to ensure that government employees retain their individual rights to free expression while allowing public employers to fulfill their duties effectively. *Id*. Further, "[i]n performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Put differently, an employer's decision to terminate an employee survives First Amendment scrutiny if there was "an adequate justification" for the termination. *Garcetti*, 547 U.S. at 418.

Here, the application of the *Pickering* balancing test overwhelmingly supports the District's decision. The undisputed facts demonstrate that Ms. Tempel's speech caused substantial disruption not only at Heyer Elementary School but throughout the District. Ms. Tempel deliberately sought national attention for her misleading claims, stating she hoped her posts would "gain national attention." [Dkt. #1, ¶¶ 41, 60; *see also* Dkt. #48, Tempel Tr. 104:17-106:7]. She succeeded, and as a direct result, the District received an influx of approximately 85 voicemails and hundreds of emails—many of them vulgar, threatening, and profane. [Defs' PFOF ¶31]. For example, these messages included:

1. "Hey, I heard your school district doesn't like gay people. Fuck you, you fucking retards! Kill yourselves!"

2. "Religious based cultural ignorance-how stupid this is. You are small mindless assholes. Consider changing this or face the consequences,"

3. "You are a fucking cunt for working for that pig. Rot in hell!"

[Defs' PFOF ¶31]. These threats created serious safety concerns, prompting a police presence and several concerned teachers to reach out to administration. [Defs' PFOF ¶53]. The Waukesha Police Department conducted threat assessments related to threats the School District of Waukesha was receiving. [Dkt. #40, Pergande Tr., 126:23-25]. According to Chad Pergande, there was a belief that the national media attention could cause people to come to Heyer Elementary and potentially cause disruption or create protests which would cause parents to worry about the safety of the kids in the school. [Dkt. #40, Pergande Tr., 127:22 – 128:19].

In response, the District was forced to increase security, diverting resources and administrative time away from its core mission of educating students. [Defs' PFOF ¶52]. Ms. Tempel's actions resulted in the staff being unable to perform their typical duties. [Defs' PFOF ¶¶58-61.] And many of the District's staff devoted the majority of their working hours during spring break and the following weeks to addressing the disruption and security concerns caused by Ms. Tempel's actions. [Dkt. #38, Sebert Tr., 144:16-145:4; Dkt. #35, Ettinger Tr., 60:3-12; Dkt. #34, Chaparro Tr., 80:18-81:3; Dkt. #33, Schneider Tr., 31:25-32:10; Dkt. #40, Pergande Tr. 24:7-25:25]. Dr. Sebert worked most of spring break, mostly full days, trying to address the media attention the District was receiving as well as determining next steps for the District. [Dkt. #38, Sebert Tr., 109:17 – 110:20]. And Principal Schneider was supposed to be on vacation during spring break, but instead he spent three house a day reviewing emails and voicemails related to Ms. Tempel's tweets, along with having conversations with Dr. Sebert, Dr. Koch, and Sharon Thiede to make plans to ensure they addressed all safety concerns of parents and staff for the students' return to school. [Dkt. # 33, Schneider Tr., 152:4 – 154:7].

17

Ms. Tempel's actions caused substantial disruption to the District and fostered a work environment of disharmony among teachers. [Dkt. # 33, Schneider Tr.,74:5-21, 129:23 – 130:15, 165:10-166:19; Dkt. #49, Dellar Tr., 22:3-23:5, 65:10-22; Dkt. #34, Chaparro Tr., 75:24-78:10]. Ms. Tempel's actions thus directly interfered with the District's ability to operate effectively and safely.

The District requires "a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services." *See Garcetti*, 547 U.S. at 418. Ms. Tempel's actions "interfere[d] with the regular operation of the [District]" because the barrage of angry phone call and email complaints disrupted multiple employees' work. *See Rankin v. McPherson*, 483 U.S. 378, 388 (1987). Furthermore, the District saw the post as "undermining the interests of the District." [Dkt. #1, ¶ 60]; *Rankin*, 483 U.S. at 389 (suggesting that speech "discredit[ing]" a public employer would tend to justify remedial measures). The Court must give, "full consideration to the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Pickering*, at 150. Continuing to employ Ms. Tempel in light of her actions would have been an ongoing, safety concern and enormous distraction to teaching and learning, as well as the relationships within the District and community. The District had a legitimate and compelling interest in mitigating this disruption and ensuring a safe learning environment.

Although the District would have been well within its right to have terminated the Ms. Tempel's employment based on potential disruption alone,[2] the factual record nonetheless abundantly demonstrates that her actions had created a significant safety concern and disruption in the time between when the District became aware of the posts and the decision to terminate was

---

[2] *See Waters v. Churchill*, 511 U.S. 661, 671 (holding that "potential disruptiveness" was sufficient for employer action in response to nurse's speech critical of her supervisor and department).

made. Here, the District's concerns were not speculative; the disruption was immediate and significant. Teachers approached the administration with concerns, and the controversy became a divisive issue among staff. [Defs' PFOF ¶80].

The timing of Ms. Tempel's posts further underscores the severity of the disruption. Her comments came in the wake of a school shooting in Nashville, Tennessee, which had heightened concerns about school safety nationwide. [Defs' PFOF ¶32]. In this context, a flood of threats and hostility toward the District only exacerbated an already sensitive situation, making safety an even more pressing concern. [Defs' PFOF ¶¶31-41].

Under these circumstances, even if Ms. Tempel's speech were entitled to First Amendment protection—which it is not—the *Pickering* balancing test still weighs decisively in favor of the District. The decision to terminate her employment was necessary to maintain a safe, orderly, and effective educational environment for students and staff. Accordingly, her First Amendment claim must fail.

**B.      Taking The Facts In The Light Most Favorable To Ms. Tempel She Cannot Establish Her Speech Was A Motivating Factor In The Decision To Terminate Her Employment With The School District Of Waukesha.**

A First Amendment retaliation claim requires the plaintiff to prove the First Amendment activity was at least a motivating factor in the defendant's decision to take the alleged retaliatory action. *Novoselsky v. Brown*, 822 F.3d 342, 354 (7th Cir. 2016) (internal citations omitted); *Wenzel v. Christopherson*, No. 16-C-1236, 2017 BL 153573, at *4 (E.D. Wis. May 8, 2017). Ms. Tempel claims "[t]he Board fired Ms. Tempel because she posted on social media and spoke to the news outlets about the District's decision regarding "Rainbowland," the District's application of Board Policy 2240, and related issues." But the undisputed facts before this Court decisively refute this allegation.

19

Ms. Tempel was not terminated for the content of her posts disagreeing with the District's decision. [Defs' PFOF ¶¶72-75]. Rather, she was terminated for the manner, method, and means by which she chose to express that disagreement—specifically, her failure to follow the appropriate chain of command and the substantial disruption her actions caused to the school environment. [Defs' PFOF ¶¶72-75].

Ms. Tempel's termination was based on multiple violations of Board policies to which she was bound as an employee. [Defs' PFOF ¶¶72-75]. The District's investigation and the Board's ultimate decision to terminate her employment expressly cited these violations as the basis for her termination. [Defs' PFOF ¶¶72-75]. As stated in the District's investigation report and Dr. Sebert's Termination Recommendation Letter:

> In this case, Ms. Tempel was entitled to disagree with the decision of the District related to the use of the song "Rainbowland" at the Heyer concert. However, the manner in which Ms. Tempel chose to express her disagreement with the District's decision was inappropriate, disruptive, and in violation of District policies.

[Defs' PFOF ¶77]. Her termination was due to her actions causing disruption and violating District Policies.

The record is clear: Ms. Tempel's termination resulted from the disruption she caused and her violation of District policies—not from any retaliatory motive based on her speech. Even when viewed in the light most favorable to her, the undisputed material facts fail to establish a causal connection between her speech and her termination. Ms. Tempel opted to post on social media about a personal grievance she had with her employer, doing so without following the appropriate chain of command or even substantiating her facts. [Dkt. #48, Tempel Tr., 204:25-206:22]. Without verifying her claims (which were entirely false) her actions were undertaken with a reckless disregard for the truth. There is simply no evidence showing the District took issue with rainbows or that it banned "Rainbowland." [Dkt. #33, Schneider Tr., 147:16-148:8]. Ms. Tempel

20

exhibited a concerning disregard for the truth before launching her media campaign against the District. She was more interested in advancing her narrative than ascertaining the truth. Ms. Tempel's social media posts and news outlet interviews were, therefore, not only breaking the chain of command policy, but also entirely false.

In summary, Ms. Tempel violated multiple District policies, recklessly spread a false narrative, and caused substantial disruption to the District. It should go without saying then, her termination was a consequence of her *actions*, not her *speech*. The facts do not support her speech being a motivating factor in her termination.

Accordingly, Ms. Tempel again has not met her burden to establish a prima facie case of First Amendment retaliation, and Defendants are entitled to summary judgment.

## II. MS. TEMPEL'S § 1983 FIRST AMENDMENT RETALIATION CLAIM AGAINST JAMES SEBERT IN HIS INDIVIDUAL CAPACITY FAILS FOR FOUR REASONS.

### A. Ms. Tempel Cannot Prove Dr. Sebert, In His Individual Capacity, Acted Under Color Of State Law.

To succeed on a claim for relief in an action brought under § 1983, a plaintiff must establish the alleged deprivation was committed under color of state law. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019). The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights. *Carey v. Piphus*, 435 U. S. 247, 254-257 (1978). The under color-of-state-law element means § 1983 does not permit suits based on private conduct, "no matter how discriminatory or wrongful." *Sullivan*, 526 U.S. at 50 (citation omitted).

However, a private citizen can act under color of law under the "conspiracy theory" of § 1983 liability if there is "evidence of a *concerted effort* between a state actor and that individual." *Spiegel*, 916 F.3d at 616; *Fries v. Helsper*, 146 F.3d 452, 457 (7th Cir. 1998). "To

21

establish § 1983 liability through a conspiracy theory, a plaintiff must demonstrate the following: (1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Id.* (internal citations omitted).

The core issue presented with regard to Dr. Sebert is not whether Ms. Tempel was discharged because of her speech, but whether Dr. Sebert's role can fairly be seen as state action. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 839 (1982). "If the action of the respondent [] is not state action, our inquiry ends." *Id.* Because Dr. Sebert—as an *individual*—did not act under color of state law and his actions cannot be fairly treated as those of the state, the inquiry ends here.

First, as discussed above, the undisputed facts show the Board – not Dr. Sebert – took official action with regard to Ms. Tempel's employment. "The Board accepted Dr. Sebert's recommendation and fired Ms. Tempel." [Defs' PFOF ¶86]. "The Board voted unanimously to adopt Dr. Sebert's recommendation and fire Ms. Tempel effective July 12, 2023." [Defs' PFOF ¶86; Dkt. #1, ¶64]. "The Board fired Ms. Tempel because she posted on social media and spoke to news outlets about the District's decision regarding "Rainbowland," the District's application of Board Policy 2240, and related issues." [Defs' PFOF ¶¶72-75]. Thus, Dr. Sebert did not take the official step that allegedly caused harm to the Ms. Tempel.

Additionally, only the Board is vested with the explicit authority to employ or dismiss a teacher. [Defs' PFOF ¶87-88]. Thus, Dr. Sebert did not even have the option of taking an official employment action with regard to Ms. Tempel because the state did not grant him the authority to do so. Deciding whether a specific official has final policymaking authority is a question of state law. *See Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1061 (7th Cir. 1998). Under Wis. Stat. § 118.22(2), "[n]o teacher may be employed or dismissed except by

a majority vote of the full membership of the board." The Complaint even admits "[t]he Board has final policymaking authority with respect to the District. Wis. Stat. § 120.44(2); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001)." (Compl, ¶ 80). Indeed, "nothing in the School Code allows us to infer that a superintendent or principal has been delegated policymaking authority with respect to personnel decisions." *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619 (7th Cir. 2001).

The case to which Ms. Tempel cites in her Complaint expressly states § 1983 liability is limited to "situations in which the official who commits the alleged violation of the plaintiff's rights has authority that is final." *Gernetzke*, 274 F.3d at 469. "School superintendents, principals, and teachers in Wisconsin do not have final authority in this sense, … as they would if the Wisconsin legislature had vested the authority to make all decisions concerning school administration in them rather than in the school boards." *Id.* Accordingly, Ms. Tempel expressly admits Dr. Sebert does not have final authority over employment decisions, which dooms her claim. Thus, Dr. Sebert cannot have acted under color of state law or have been considered a state actor where he had no state-designated authority to take employment actions as to a teacher, and the facts show only the Board took official employment action with regard to Ms. Tempel.

Second, nor do the facts establish a conspiracy theory for individual § 1983 liability. In her deposition, Ms. Tempel attempts to support her claim against Dr. Sebert by alluding to the fact Dr. Sebert made a recommendation to the Board in favor of terminating Ms. Tempel's employment after adopting the findings of an investigation into Ms. Tempel's misconduct. [Dkt. #48, Tempel Tr.; Dkt. #1, ¶¶ 61, 76]. However, a mere recommendation is not an official action. Nor can a recommendation be construed as joint action. The Board was free to take whatever action it deemed appropriate based on evidence presented at the hearing, regardless of any

23

recommendation.  Again, "[n]o teacher may be employed or dismissed except by a majority vote of the full membership of the board."  Wis. Stat. § 118.22(2).

The undisputed facts simply do not show Dr. Sebert and the Board reached an understanding to deprive Ms. Tempel of her constitutional rights or Dr. Sebert participated in joint activity with the Board. The Board held a hearing to consider all relevant facts and circumstances and unanimously voted to terminate Ms. Tempel on July 12, 2023.  [Defs' PFOF ¶¶87-88]. Dr. Sebert had no authority to participate jointly with the Board in the Board's determination or ultimate decision regarding Ms. Tempel's employment. Ms. Tempel has offered no evidence indicating Dr. Sebert joined personally in the alleged deprivation which forms the basis for Ms. Tempel's claims. A mere recommendation does not rise to the level of mutual understanding or joint action.

In addition, during their depositions, each Board member was asked whether he/she felt any pressure to accept Dr. Sebert's recommendation.  [Defs' PFOF ¶87].  Every single Board member testified he/she felt no pressure to accept Dr. Sebert's recommendation and felt free to make an independent decision regarding Ms. Tempel's continued employment based solely on the information presented during the hearing before the Board.  [Defs' PFOF ¶88].

The record is completely void of any allegations of joint action between Dr. Sebert and the Board and, as mentioned above, the facts elicited during discovery show no such conspiracy took place.  Even "mere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Fries*, 146 F.3d at 458. Thus, Dr. Sebert cannot have acted under color of state law and the allegations with regard to Dr. Sebert in his individual capacity fail.

24

**B.** **Ms. Tempel Cannot Establish A Causal Connection Between Dr. Sebert And The Official Termination Action.**

To recover damages under § 1983, a plaintiff must establish a defendant was personally responsible for the deprivation of a constitutional right. *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1248 (7th Cir. 1994). "An official satisfies the personal responsibility requirement of section 1983 if she acts or fails to act with a *deliberate or reckless disregard* of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge and consent." *Crowder v. Lash*, 687 F.2d 996, 1005 (7th Cir. 1982) (emphasis added). In short, some causal connection between the action complained about and the individual sued is necessary for § 1983 recovery.

The undisputed facts fail to show viable causal connection between Dr. Sebert and the Board's official employment action. Although Ms. Tempel claims Dr. Sebert's conduct was "malicious or in reckless disregard of Ms. Tempel's First Amendment right to freedom of speech," Dr. Sebert's conduct does not rise to the requisite level. [Dkt. #1, ¶66]. The deliberate or reckless disregard standard is simply not met here, despite a conclusory statement to that effect. Ms. Tempel has failed to prove any viable causal connection between Dr. Sebert and the Board's official termination action. Ms. Tempel specifically admits Dr. Sebert did not take the alleged adverse action and he in no way could have ("The Board fired Ms. Tempel." [Dkt. #1, ¶79]. "The Board has final policymaking authority with respect to the District. Wis. Stat. § 120.44(2); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 469 (7th Cir. 2001)." [Dkt. #1, ¶80]. Although Dr. Sebert issued a recommendation in favor of terminating Ms. Tempel, the Board at all times maintained final authority and was free to take whatever action it deemed appropriate based on evidence presented at the hearing. Ms. Tempel has offered no support indicating Dr. Sebert participated personally in the alleged deprivation which forms the basis for Ms. Tempel's

25

claims. Thus, there is simply no causal connection between Dr. Sebert and the Board's action in terminating Ms. Tempel's employment.

Even if this Court were to find a viable connection between Dr. Sebert and the Board's official action (and none exists), the facts only show Dr. Sebert's conduct was reasonable and did not rise to the level of "deliberate or reckless disregard." As written in the letter Dr. Sebert sent to Ms. Tempel on May 15, 2023, Dr. Sebert states Ms. Tempel was "entitled to disagree with the decision of the District related to the use of the song 'Rainbowland' at the Heyer concert." [Dkt. #1, ¶60]. Again, the issue was not with the content of Ms. Tempel's speech disagreeing with the District's decision. Rather, the issue was with the manner, method, and means in which Ms. Tempel chose to express her disagreement.

As further explained in the letter, the manner in which Ms. Tempel chose to express her disagreement with the District's decision was "inappropriate, disruptive, and in violation of various District policies." [Dkt. #1, ¶ 60]. In other words, Ms. Tempel failed to follow the appropriate chain of command. She did so "deliberately and repeatedly" beginning on March 21, 2023. [Dkt. #1, ¶ 60]. Such intentional misconduct and the impact it had on the District could not be tolerated. [Dkt. #1, ¶ 60].

There is no doubt Dr. Sebert acted reasonably in adopting the findings of the investigation and issuing a recommendation in favor of terminating Ms. Tempel. The undisputed facts in no way show deliberate or reckless disregard of Ms. Tempel's constitutional rights. To the contrary, Dr. Sebert explicitly respected her constitutional rights by stating Ms. Tempel was entitled to disagree with the District's decision and it was simply the manner in which she chose to express her disagreement that was inappropriate, disruptive and in violation of various District policies. [Defs' PFOF ¶82].

"As an employer, a governmental agency must have the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the workplace, foster disharmony, and ultimately impair the efficiency of an office or agency." *Connick*, 461 U.S. at 151; Khuans *v. Sch. Dist. 110*, 123 F.3d 1010, 1014 (7th Cir. 1997). Thus, even if the Court were to find a causal connection between Dr. Sebert and the Board's official action (and none exists), the facts only show Dr. Sebert acted reasonably and within the confines of the law. Such conduct simply did not rise to the requisite level of "deliberate or reckless disregard." Accordingly, the allegations with regard to Dr. Sebert in his individual capacity fail.

### C. The Undisputed Facts Do Not Establish A First Amendment Retaliation Claim.

With respect to the individual capacity issue, it is necessary to consider whether a plaintiff has successfully established a First Amendment retaliation claim. *See Horwitz*, 260 F.3d at 618. In order to establish a § 1983 claim under the First Amendment, the plaintiff has the burden of establishing (1) his or her conduct was constitutionally protected, and (2) the protected conduct was a "substantial" or "motivating" factor in the decision to terminate him or her. *Mt. Healthy City School District Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Swetlik v. Crawford*, 738 F.3d 818 , 825 (7th Cir. 2013); *Nieves v. Bd. of Educ. of City of Chi*., 297 F.3d 690, 693 (7th Cir. 2002); *Horwitz*, 260 F.3d at 618; *Pugh v. City of Attica, Indiana*, 259 F.3d 619, 629-30 (7th Cir. 2001); *Gooden v. Neal*, 17 F.3d 925 , 928 (7th Cir. 1994). If he or she carries that burden, then the defendants would have the opportunity to establish they would have reached the same decision even in the absence of the protected conduct. *Nieves*, 297 F.3d at 693. If the speech at issue is not a "substantial or motivating factor" in a district's decision to terminate an employee, then the

plaintiff cannot have established a successful First Amendment retaliation claim against school district officials in their individual capacities. *See Horwitz*, 260 F.3d at 618.

First, as discussed in detail above, Ms. Tempel's activity was not protected by the First Amendment because the undisputed facts do not support her conclusion that her speech (1) is made as a private citizen, (2) addresses a matter of public concern and (3) her interest outweighs the state's interest as an employer in "promoting effective and efficient public service." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008).

Second, as is also set forth above, the alleged protected activity was not a substantial or motivating factor in the decision to terminate Ms. Tempel. Rather, the issue was with the manner, method, and means in which Ms. Tempel chose to express her disagreement, which was in violation of multiple District policies.

On a related note, as discussed above, Dr. Sebert did not take any official termination action against Ms. Tempel. [Defs' PFOF ¶¶87-88]. Ms. Tempel offers no allegation indicating Dr. Sebert participated personally in the alleged deprivation which forms the basis for Ms. Tempel's claims. Nor does a mere recommendation (which was made in his official capacity and pursuant to Board Policies) carry any weight. The Board was free to take whatever action it deemed appropriate based on the evidence presented at the hearing. [Defs' PFOF ¶¶87-88]. Thus, there is simply no causal connection between Dr. Sebert and the Board's action in terminating Ms. Tempel's employment.

Because the speech at issue was not a "substantial or motivating factor" in the Board's decision to terminate Ms. Tempel, Ms. Tempel cannot have established a successful First Amendment retaliation claim against Dr. Sebert in his individual capacity. *See Horwitz*, 260 F.3d at 618. Thus, the allegations with regard to Dr. Sebert in his individual capacity fail.

**D.      In Any Event, Superintendent Sebert Is Entitled To Qualified Immunity.**

Even if somehow the Court were to conclude the Ms. Tempel properly pled a First Amendment claim, Dr. Sebert is entitled to qualified immunity. Qualified immunity offers complete protection for individual public officials performing discretionary functions "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  For the law to be clearly established, the law "must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). Government employees can act lawfully even when motivated by a dislike or hostility to certain protected behavior.  *See Mt. Healthy*, 429 U.S. at 286-287.

Here, there is no doubt Dr. Sebert, Superintendent, was performing discretionary functions pursuant to Board Policies. Nor is there any possibility Dr. Sebert could have known his ordinary course of disciplinary action in adopting the findings of an investigation, that looked into alleged misconduct and found multiple policy violations, and recommending the Ms. Tempel's termination as a result of such misconduct allegedly violated the Ms. Tempel's First Amendment rights. There is no allegation in the Complaint of facts or law that would have placed Dr. Sebert on notice he was constitutionally prohibited from adopting the findings of an investigation or issuing a recommendation for termination of a teacher who substantially disrupted the school environment and violated multiple District policies by usurping the chain of command and instead took her concerns as public as possible. Thus, in any event, the claims against Dr. Sebert should be dismissed under the doctrine of qualified immunity.

29

It is important to note the Complaint does not make allegations against Dr. Sebert in his official capacity. Even if it did, Dr. Sebert would be immune from claims for monetary damages under Section 1983. *Maddox v. Love*, 655 F.3d 709, 716 (7th Cir. 2011) (*citing Brown v. Budz*, 398 F.3d 904, 917-18 (7th Cir. 2005) ("To the extent [the plaintiff] seeks monetary damages from defendants acting in their official capacity, those claims ... are dismissed as they are barred by the Eleventh Amendment.")). As such, based on the foregoing, Ms. Tempel's claims against Dr. Sebert in his individual capacity fail.

<u>CONCLUSION</u>

As set forth above, Defendants respectfully request the Court grant their joint motion for summary judgment because there are no disputed material facts and they are entitled to judgment as a matter of law on the lone count of First Amendment retaliation contained in Plaintiff's Complaint.

Dated this 21st day of February, 2025.

Respectfully Submitted,

BUELOW VETTER BUIKEMA OLSON
& VLIET, LLC

*/s/ Joel S. Aziere*
Joel S. Aziere (WI Bar No. 1030823)
jaziere@buelowvetter.com
Christina A. Katt (WI Bar No. 1073979)
ckatt@buelowvetter.com
Hunter M. Cone (WI Bar No. 1123048)
hcone@buelowvetter.com

Buelow Vetter Buikema Olson & Vliet, LLC
20855 Watertown Road, Suite 200
Waukesha, Wisconsin 53186
Telephone: (262) 364-0250
Facsimile: (262) 364-0270

*Attorneys for Defendants, School District of Waukesha and James Sebert*

30