IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

MELISSA TEMPEL,

   *Plaintiff*

  v.                                                                                            No. 2:23-CV-01169

SCHOOL DISTRICT OF WAUKESHA
and JAMES SEBERT,

   *Defendants*

**BRIEF *AMICI CURIAE* OF THE WISCONSIN EDUCATION ASSOCIATION COUNCIL AND NATIONAL EDUCATION ASSOCIATION IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

The Wisconsin Education Association Council (WEAC) and National Education Association (NEA) submit this brief as *Amici Curiae* in support of Plaintiff Melissa Tempel's motion for summary judgment.

### INTRODUCTION AND
### STATEMENT OF INTERST OF *AMICI CURIAE*

Since 2020, new laws and policies affecting teaching in public schools have proliferated across the country. As of September 2024, 20 states had passed laws or statewide policies "that aim[ed] to restrict the ways educators can teach difficult subjects, like the history of racism or sexism in America." Nat'l Educ. Ass'n, *Educator Rights to Teach Sensitive Topics* (last visited February 20, 2025). Eight had passed laws or policies specifically to "prevent educators from discussing or potentially even recognizing LGBTQ+ individuals." *Id.* Some school districts, like the one in this case, have passed local policies preventing or limiting the discussion of "controversial" subjects. This censorship has raised concerns from communities that see these

policies as part of a concerted attack on civil rights, including LGBTQ rights, and who believe these policies negatively affect public education. *See* Brenda Álvarez, *Educators Mobilize Against Anti-LGBTQ+ Laws*, NEA TODAY (Oct. 28, 2022). Teachers, too, have spoken out against these policies in their districts. *See id.*

Plaintiff Ms. Tempel is one of those teachers. In this case, the School District's "controversial issues in the classroom policy" was a subject of ongoing controversy in the community. *See* Pltf's Summ. Judg. Br. ECF No. 65 at 2–4. When the elementary school Ms. Tempel taught at applied this controversial-issues policy to prohibit students from singing "Rainbowland" by Dolly Parton and Miley Cyrus—a song about acceptance that has been interpreted by some to be about LGBTQ inclusion[1]—at the Spring Concert, she criticized the decision publicly on social media. *See id.* at 5–6. Once Ms. Tempel exposed the way the School District was using this policy to stifle benign displays of LGBTQ acceptance, public outcry ensued. *See id.* Rather than engaging in this discourse and responding to the community's concerns about its policy and the way it had been enforced, the School District and Dr. Sebert responded by suspending, investigating, and then terminating Ms. Tempel. *See id.*

As labor organizations representing educators in Wisconsin, *Amici* have an abiding interest in the issues raised in this case. NEA is the nation's largest labor organization, representing approximately three million members who serve as educators, counselors, and education support professionals in our nation's public schools and institutions of higher

---

[1] *See* Anya Zoledziowski, *First Graders Not Allowed to Sing 'Controversial' Dolly Parton Song About Acceptance*, VICE (Mar. 27, 2023) ("Some critics believe the songs were banned as part of a greater crackdown within the school district on LGBTQ issues. One Waukesha resident, Leigh Radichel Tracy, whose children are in the same school district, [said] that 'the School District of Waukesha has really cracked down on anything LBGTQ.'").

education. WEAC is NEA's statewide affiliate in Wisconsin. Thousands of NEA and WEAC members work in Wisconsin's K-12 public schools and colleges.

*Amici* are deeply concerned about the proliferation of vague laws that stifle what educators may teach and what students may learn—particularly when those restrictions interfere with students' ability to understand social issues affecting their lives and difficult periods of our nation's history. *Amici* also have an abiding interest in ensuring that their members are not threatened with potential discipline or job loss for exercising their First Amendment right to speak as private citizens on matters of public concern. That interest is particularly acute in this case, given that Defendants have advanced arguments that would effectively nullify educators' First Amendment rights or badly distort the balancing of interests called for by *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968). *See* Defs' Summ. Judg. Br., ECF No. 70 at 15–21. *Amici* therefore submit this brief to emphasize two main points about the issues raised in this case that may have a broader impact on educators throughout the state and even the country.

First, the Court should reject the Defendants' effort to block Ms. Tempel's claim by invoking a broad chain-of-command policy, which requires all concerns to be raised and resolved only internally with school administrators. As a matter of both common sense and binding precedent, workplace policies cannot deprive educators of their First Amendment right to speak as citizens on matters of public concern. And in this case, such a policy cannot negate the fact that the School District terminated Ms. Tempel because of her protected speech.

Second, in balancing the interests under *Pickering*, this Court should place significant weight on the importance of Ms. Tempel's speech, which exposed potentially discriminatory censorship by the School District that was deeply concerning to the community. On the other side of the balance, the Court should discount the Defendants' claims that public scrutiny for

their actions constitutes a disruption that would justify punishing Ms. Tempel for her speech. As a public body democratically accountable to the citizenry, the School District has no legitimate interest in shielding its actions from public scrutiny and criticism. Moreover, the School District's own actions both prior to and in the wake of Ms. Tempel's social posts contributed significantly to the unwanted public scrutiny it received. This Court should therefore conclude that Ms. Tempel's interest in speaking out—and the public's corresponding interest in hearing her speech—far outweigh the School District's asserted interest in silencing her.

## ARGUMENT

### A. Public-School Employers Cannot Rely on Workplace Rules—Including "Chain of Command" Policies—to Discipline or Discharge An Employee for Engaging in Citizen Speech Protected by the First Amendment

Throughout the events underlying this case, and during the litigation itself, the Defendants have sought to justify the suspension, investigation, and ultimate firing of Ms. Tempel on the ground that her speech to the public about their application of the "controversial issues" policy violated a different School District policy: one that purportedly requires School District employees to raise all work-related issues through a specified "chain of command" policy. *See*, *e.g.*, Complaint, ECF No. 1 at ¶ 60 (quoting the Defendant Sebert's termination notice to Ms. Tempel stating, "You failed to raise your concerns through the appropriate channels and instead took your concerns public"). But public-school employers cannot rely on workplaces rules—including "chain of command" policies—to discipline or discharge an educator for engaging in citizen speech protected by the First Amendment.

Public-school teachers do not relinquish the "First Amendment rights otherwise enjoyed by citizens just by reason of [their] employment." *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004) (per curiam) (citing *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06 (1967)).

- 4 -

Indeed, their right as citizens to speak out "on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane v. Franks*, 573 U.S. 228, 240 (2014). They are "the members of a community most likely to have informed and definite opinions" as to the operation of the public schools. *Id.* (quoting *Pickering*, 391 U.S. at 572). And the public's need for such information is especially important given that "no single tradition in public education is more deeply rooted than local control," which "affords citizens an opportunity to participate in decision-making" and "permits the structuring of school programs to fit local needs." *Martinez v. Bynum*, 461 U.S. 321, 329 (1983) (cleaned up).

In other words, the First Amendment values advanced by educators' speech about school matters extend, not only to their own interest in speaking out, but also to the "public's interest in receiving informed opinion" about the operation of their public schools. *Lane*, 573 U.S. at 236. If schools were allowed to muzzle educator speech on matters of public concern, "the community would be deprived of informed opinions on important public issues." *Roe*, 543 U.S. at 82. It is therefore "essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Lane*, 573 U.S. at 240.

Of course, public school districts—like any government employer—have an "interest in controlling the operation of [their] workplaces." *Id.* at 236. They may therefore maintain working conditions and rules to promote "the efficiency of the public services [they] perform[] through [their] employees." *Pickering*, 391 U.S. at 568. But that authority has limits. It is a "fundamental principle" that a public employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Heideman v. Wirsing*, 7 F.3d 659, 661 (7th Cir. 1993) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

So, just as the government acting as a sovereign cannot enact laws that abridge the constitutional rights of its citizens, a school district acting as an employer cannot impose workplace rules that forfeit or supersede the constitutional rights of its educator employees. Workplace rules that conflict with public employees' constitutional rights are invalid and unenforceable. *See United States v. Treasury Employees*, 513 U.S. 454, 467–68 (1995) (striking down, as a violation of the First Amendment, a rule that prohibited federal employees from accepting honoraria for giving speeches or writing articles); *Crue v. Aiken*, 370 F.3d 668, 678–80 (7th Cir. 2004) (same with regard to a directive banning university faculty from contacting prospective student athletes to inform them about the school's racially offensive mascot).

Rules that require employees to raise issues through an established chain of command raise particularly serious First Amendment concerns. After all, in the wake of the Supreme Court's decision in *Garcetti v. Ceballos,* 547 U.S. 410 (2006), many courts—including the Seventh Circuit—have held that a "public employee's complaints made directly up the chain of command to his supervisors are not protected under the First Amendment." *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014) (cleaned up). Thus, if a rule mandating that all concerns be raised through an internal chain of command could be enforced, it would effectively nullify the right of employees to speak out publicly as citizens on "matters concerning government policies that are of interest to the public at large." *Roe*, 543 U.S. at 80.

For that very reason, courts have routinely found broad chain-of-command and similar rules facially unconstitutional because they operate as unlawful restraints on public employees' free-speech rights.[2] Even where such rules are not facially invalid, they are unenforceable as

---

[2] *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1185–87 (10th Cir. 2010) (holding that a directive to school employees not to discuss "school matters" with anyone outside the agency "violated Plaintiffs' free speech rights"); *Luethje v. Peavine Sch. Dist.*, 872 F.2d 352, 353 (10th
(*continued . . .*)

applied to suppress employees' protected speech. *See Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 383 (7th Cir. 2009) (explaining that if the sheriff's office enforces its policy to officers speaking as citizens on matters of public concern, it "exposes itself to an as-applied challenge to the Policy or a claim for First Amendment retaliation"). By contrast, courts have upheld chain-of-command policies that are strictly limited to workplace concerns and employee speech that falls wholly outside the protection of the First Amendment. *See id.*; s*ee also Samuelson v. LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1052 (7th Cir. 2008) (holding that a school district's chain-of-command policy did not constitute a prior restraint because it did not limit the ability of staff to speak as citizens on matters of public concern).

Here, the Defendants invoke the School District's own chain-of-command policy to defeat Ms. Tempel's First Amendment claim.[3] They claim that their policy broadly prohibits

---

Cir. 1989) (striking down as unconstitutional a school board rule directing that if employees "have any problems, consult [the principal]," and "[d]on't take any school problems other places, or discuss it with others"); *Liverman v. City of Petersburg*, 844 F.3d 400, 407–08 (4th Cir. 2016) (same with regard to a police department's social-media policy prohibiting the dissemination of any information "that would tend to discredit or reflect unfavorably upon" the department); *Moonin v. Tice*, 868 F.3d 853, 858–62, 867 n.7 (9th Cir. 2017) (same with regard to a highway patrol's directive requiring employees to "channel their concerns through the chain of command" and prohibiting contact with "ANY non-departmental and non-law enforcement entity or persons for the purpose of discussing" the department's operations); *Barone v. City of Springfield*, 902 F.3d 1091, 1102–03 (9th Cir. 2018) (same with regard to a police department's directive that officers "shall not publicly criticize or ridicule the Department, its policies, or other members"); *Barrett v. Thomas*, 649 F.2d 1193, 1199 (5th Cir. 1981) (same with regard to a facial challenge to the "sheriff's office personnel regulations prohibiting 'unauthorized public statements,' comments by employees to reporters on any topic 'that is or could be of a controversial nature'" and certain types of comments by employees to elected officials); *O'Laughlin v. Palm Beach County*, 30 F.4th 1045, 1054 (11th Cir. 2022) (same with regard to a fire department's social-media policy that prohibited disseminating content that "could be reasonably interpreted as having an adverse effect upon . . . morale, discipline, operations, the safety of staff, or perception of the public"); *see also Hernandez v. City of Phoenix*, 43 F.4th 966, 982 (9th Cir. 2022) (recognizing that a police department's "policy that prohibits public employees from divulging any information acquired while on the job would silence speech that warrants the strongest First Amendment protection").

[3] The Defendants also invoke two other policies to justify Ms. Tempel's termination: (1) Policy 3310, which effectively states the *Garcetti*/*Pickering* standard for educator speech and (2) Policy 3213, which requires educators to exhibit a standard of care toward students commensurate with their role and responsibilities. *See* Pltf's Summ. Judg. Br. ECF No. 65 at 7 n.2. Both of these policies, like the chain-of-
(*continued . . .*)

their employees from speaking about school-related issues outside of the internal hierarchy of the School District administration. *See* Defs' Summ. Judg. Br., ECF No. 70 at 19–21; *see also* Defs' Statement of Facts, ECF No. 69 at ¶¶ 72, 73, 82. And they argue further that, if they can prove they based their decision to terminate Ms. Tempel not on the content of her speech, but on the fact that she spoke in violation of the chain-of-command policy, her retaliation claim fails. *See id.* This argument is badly misguided.

*First*, it defies common sense. A government employer cannot magically avoid the First Amendment through the expedient of enacting a policy that prohibits employee speech, then enforcing that policy to punish an employee's protected speech, and then claiming that the punishment was due—not to the employee's protected speech—but merely to the violation of the rule. "[The government] cannot foreclose the exercise of constitutional rights by mere labels." *NAACP v. Button*, 371 U.S. 415, 429 (1963). And there is no legal or practical difference between firing an employee *for violating a rule against speaking publicly* and firing that employee *for speaking out publicly*. Indeed, if school administrators could freely enforce broad chain-of-command policies that prohibit educators from speaking out as citizens on matters of public concern, then educators' protected speech in many of the Supreme Court's seminal cases on the First Amendment rights of government employees could have been silenced.[4]

---

command policy, fail to provide a legitimate justification for terminating Ms. Tempel. The first policy essentially acknowledges Ms. Tempel's rights, so it could not have been violated unless her speech itself was unprotected. As for the second, Plaintiff's mere reference to "[her] students" in her social media post cannot deprive her speech of protection. *See Lane*, 573 U.S. at 240 (the First Amendment protects "citizen's speech" that "concerns information acquired by virtue of his public employment").

[4] *See Pickering*, 391 U.S. at 566 (teacher addressed the public directly by publishing a letter to a newspaper criticizing Board of Education's school finance proposal); *Perry v. Sindermann*, 408 U.S. 593, 594–95 (1972) (teacher directly addressed the state legislature by giving testimony in support of positions opposed by his employer); *Madison Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 171 (1976) (teacher directly addressed the Board of Education in an opening meeting to raise questions about teachers' terms of employment); *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 282 (1977) (teacher

(*continued . . .*)

*Second*, and more crucially, Defendants' argument is foreclosed by controlling Seventh Circuit precedent in *Knapp v. Whitaker*, 757 F.2d 827 (7th Cir. 1985). In *Knapp*, the school district had a similar chain-of-command policy as the District in this case: it required that "all [staff] communications made to the Board shall be through [the superintendent]." *Id.* at 832 n.5. Just like Ms. Tempel, Mr. Knapp criticized a school policy outside of his chain of command. *See id.* at 831 (noting that Mr. Knapp contacted school board members directly to express concern over the mileage allowance and liability insurance for coaches who drive student-athletes to games). Just as the District claims in this case that it terminated Ms. Tempel for violating the chain-of-command policy, the district claimed in *Knapp* that it terminated Mr. Knapp for violating the chain-of-command policy. *Id.* at 832, 846. The Seventh Circuit rejected this argument, concluding that "Knapp's speech was constitutionally protected" and that "the defendants could not rely upon [the chain-of-command policy] to justify their actions because that provision improperly restricted speech on matters of public concern." *Id*. at 846. This Court should therefore reach the same conclusion—Ms. Tempel's speech was constitutionally protected and the Defendants cannot rely upon the School District's chain-of-command policy to justify her termination because that policy itself restricts speech on matters of public concern.

B. *Pickering*'s Balance of Interests Weighs Heavily in Favor of Educator Speech that Exposes Censorship and Discrimination, Even When It Results in Public Controversy

The judgment of school officials on matters involving a wide variety of educational issues in schools "cannot, in a society that leaves such questions to a popular vote, be taken as conclusive." *Pickering*, 391 U.S. at 571–72. Instead, "free and open debate" on such matters "is

---

addressed the public directly by calling a radio station to relay news about a newly introduced dress-code policy).

vital to informed decision-making by the electorate." *Id*. at 572. Accordingly, when an educator speaks on vital educational issues, the court must weigh the importance of that speech heavily in the educator's favor. On the flip side, the court should not weigh the inevitable public outcry that follows in favor of the government—it is simply part of free and open debate in a democratic society.

Ms. Tempel's speech exposed what many perceived as the School District's anti-LGBTQ censorship and discrimination, done under the guide of its "controversial issues" policy. *See* Pltf's Summ. Judg. Br. ECF No. 65 at 5–6. Her speech on this topic took place in the context of a broader series of actions by the School District to purge any symbols of support for marginalized communities, including the removal of rainbow flags, safe-space signs, and Black Lives Matter posters. *See id.* at 2–4. For two years before Ms. Tempel spoke out about "Rainbowland," the School District's "controversial issues" policy had already generated significant outcry from concerned members of the community. *See id.* Ms. Tempel's revelations on social media added to those existing concerns and amplified demands for transparency and accountability from the School District. Contrary to what the Defendants have argued, *See* Defs' Summ. Judg. Br., ECF No. 70 at 15–19, these are not circumstances where a public employer is justified in silencing citizen speech by educators.

The Supreme Court's decision in *Pickering* contemplates a balancing "between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. at 568. In this case, it is important to highlight several ways in which the importance and context of Ms. Tempel's speech, as well as its effect on the School District, affect *Pickering*'s balance of interests.

*First*, the fact that Ms. Tempel's speech raised issues of significance to the public should weigh very heavily in her favor. *See Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997) (explaining that, when an employee's speech "touch[es] on a matter of strong public concern," the government needs to "offer particularly convincing reasons to suppress it"); *accord Lane*, 573 U.S. at 242; *Connick v. Myers*, 461 U.S. 138, 152 (1983). This is particularly true given that her speech exposed a government practice as controversial as discrimination. *See, e.g., Love-Lane v. Martin*, 355 F.3d 766, 778 (4th Cir. 2004) (holding that the school administrator's speech about "race discrimination against African American students in a public school involves a serious and substantial issue of public concern… of special importance to parents of African American children at [the school] and to many in the larger community" that required the government to "bear a heavier burden in attempting to show their efficiency concerns outweigh" those interests); *Crue*, 370 F.3d at 680 (explaining that the "free-speech interest" of university faculty members "in questioning what they see as blatant racial stereotyping is substantial"). In a circumstance like this, even a "major disruption . . . may be overbalanced by first amendment interests." *O'Donnell v. Yanchulis*, 875 F.2d 1059, 1062 (3d Cir. 1989).

This is because the First Amendment places a premium on the public's interest in hearing speech on important issues, particularly when it involves potential misconduct by the government. *See Love-Lane*, 355 F.3d at 778. And it "should not be the least surprising that accusations of impropriety would cause some disruption." *Stump v. Richland Twp.*, 278 F. App'x 205, 207 (3d Cir. 2008). It would "be absurd to hold that the First Amendment generally authorizes . . . officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office." *Id.*; *see also Conaway v. Smith*, 853 F.2d 789, 798 (10th Cir. 1988) (explaining that it "would be anomalous," to allow the public to be deprived of

information about these potential government improprieties simply because an "employee's whistle blowing might jeopardize the harmony of the office or tarnish [its] integrity"). Ms. Tempel's speech clearly falls in this category and triggers the government's need to provide particularly convincing reasons for suppressing her speech.

*Second*, the public scrutiny the School District received due to Ms. Tempel's speech should not count against First Amendment protection. Government institutions cannot point to public scrutiny as disruption under *Pickering*, given that responding to public scrutiny is part of their job in a democratic society:

> Although it could be true that [government bodies] would operate more efficiently absent inquiry into their practices by the public and the legislature, efficiency grounded in the avoidance of accountability is not, in a democracy, a supervening value. Avoiding accountability by reason of persuasive speech to . . . the public is not an interest that can justify curtailing [employees'] speech as citizens on matters of public concern.

*Moonin*, 868 F.3d at 866; *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 495 (1975) (explaining that the protections of the First Amendment are "of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business").

This is particularly true for educators' speech about the functioning of public schools. As democratically accountable entities, schools are expected to be subject to—and to respond to—public scrutiny. Public controversy alone is therefore insufficient to outweigh the value of an educator's speech as a citizen on an important matter of public concern. *See Luethje v. Peavine Sch. Dist.*, 872 F.2d 352, 355 (10th Cir. 1989) (fact that educator's speech "created a community controversy" was insufficient to render the speech unprotected); *Piver v. Pender County Bd. of Educ.*, 835 F.2d 1076, 1081 (4th Cir. 1987) (holding that the "weighty interests" supporting the educator's speech were more important than the school board's asserted threat of "turmoil" resulting from public controversy). Accordingly, this Court should not be swayed by the

Defendants' efforts to use the predictable public scrutiny it received for a controversial decision as leverage to defeat Ms. Tempel's First Amendment claim.

*Third*, and finally, the Defendants' claims of disruption should be heavily discounted because of the School District's own role both in creating an environment where its actions would trigger public scrutiny and in exacerbating the specific controversy exposed by Ms. Tempel's social media posts. A public-employer defendant "cannot rely on disruption which they instigated or exacerbated to outweigh [an employee's] first amendment rights." *Roth v. Veteran's Admin. of Gov't of U.S.*, 856 F.2d 1401, 1408 (9th Cir. 1988), *abrogated on other grounds by Garcetti,* 547 U.S. at 416; *see Zamboni v. Stamler*, 847 F.2d 73, 79 (3d Cir. 1988) (explaining that a court "must consider whether any unrest was caused directly by [the employee's] speech or whether it was exacerbated by [the employer's] actions.").

Here, to the extent the disruption went beyond the amount and type expected from public criticism of the government, that disruption was exacerbated by the School District's own actions. For over a year before Ms. Tempel spoke out about the removal of "Rainbowland" from the school concert, the School District took a series of actions to make itself a lightning rod for public controversy. In 2021, the School District earned significant scrutiny from the media and local community—as well as a rebuke from the ACLU of Wisconsin—for enforcing its "controversial issues" policy to purge schools of signs supporting LGBTQ students and Black Lives Matter. *See* Samantha Hendrickson & Alex Groth, *Students and parents rally against the Waukesha School District's ban on LGBTQ+ and other 'controversial' signs*, MILWAUKEE JOURNAL SENTINEL (Oct. 14, 2021); ACLU-Wisconsin, *ACLU of Wisconsin Requests Records Regarding Ban on Alleged Controversial and Political Signs in Waukesha School District* (April 7, 2022). In the course of enforcing this policy, the School District also suspended a middle

school teacher for displaying a Pride flag in her classroom, triggering further press scrutiny and protests in the community. *See* Drake Bentley, *[A Waukesha school teacher pinned a pride flag in her classroom, She was suspended after refusing to take it down](#)*, MILWAUKEE JOURNAL SENTINEL (Dec. 16, 2021); Jake Ekdahl, *[Protest held over Waukesha teacher suspended for Pride flags](#)*, THE FREEMAN (Dec. 18, 2021). Defendants' actions even took a toll on the School District's workforce: "[b]y June 2022, 54 teachers had resigned from the District, and many of those teachers publicly cited the Controversial Issues Policy, the [related ban on signage relating to controversial issues] and the District's treatment of marginalized students as the reason for their resignation." *See* Pltf's Summ. Judg. Br. ECF No. 65 at 3. These actions, all of the School District's own making, laid a foundation of public scrutiny and mistrust well before Ms. Tempel spoke out.

And once Ms. Tempel spoke out, the Defendants' escalating retaliatory responses to her speech fueled even greater scrutiny and public criticism. National news outlets reported the decision to intercept Ms. Tempel upon her arrival at school the next day, to have her escorted from the premises, and to place her on administrative leave. *See*, *e.g*., Prem Thakker, *[Wisconsin Teacher Who Complained About "Rainbowland" Song Ban Placed on Administrative Leave](#)*, THE NEW REPUBLIC (April 11, 2023). And even more expansive national news coverage followed the Defendants' decision to terminate her. *See*, *e.g.*, Kory Grow, *[Teacher Fired Over Wanting First Graders to Sing Miley Cyrus and Dolly Parton's 'Rainbowland,'](#)* ROLLING STONE (July 13, 2023). Ms. Tempel can hardly be faulted for the public reaction the Defendants themselves provoked when they took the maximally punitive approach in responding to Ms. Tempel's speech. On the contrary, it was the Defendants that had—but chose to forgo—the option of simply letting public debate over the application of its policies play out. *See Pickering*,

391 U.S. at 571–72 (explaining that "free and open debate" on school matters "is vital to informed decision-making by the electorate").

Taken together, these factors tip the *Pickering* balance sharply in Ms. Tempel's favor. She spoke on a pressing issue of growing nationwide importance and of particular importance to her community. The predictable public outcry and scrutiny that followed provides no reason for holding her speech unprotected. Indeed, the School District itself bears a significant amount of responsibility for the degree to which its actions became a lightning rod of controversy. Defendants cannot suppress Ms. Tempel's speech by pointing to public outcry over its own policies and practices—nor can it hide behind a broadly unconstitutional policy. On the contrary, in circumstances like this, it is "essential" that educators "be able to speak out freely on such questions without fear of retaliatory dismissal." *Lane*, 573 U.S. at 240.

## CONCLUSION

For the foregoing reasons, the plaintiff is entitled to judgment as a matter of law and the court should grant the plaintiff's motion for summary judgment.

Respectfully submitted,

/s/ Elizabeth A. Fernandez
Elizabeth A. Fernandez (SBN 1040206)
Wisconsin Education Association Council
33 Nob Hill Rd
PO Box 8003
Madison, WI 53708-8003
Phone: (608) 276-7711
Fax: (608) 298-2326
Email: fernandeze@weac.org

Attorney for *Amici Curiae* WEAC and NEA

Dated: February 28, 2025