# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MELISSA TEMPEL,**

    **Plaintiff,**

    **v.**                                       **Case No. 23-CV-1169**

**SCHOOL DISTRICT OF WAUKESHA and
JAMES SEBERT,**

    **Defendants.**

---

## DECISION AND ORDER ON PLAINTIFF'S AND DEFENDANTS' CROSS MOTIONS FOR SUMMARY JUDGMENT

---

    Melissa Tempel, a former first grade teacher at Heyer Elementary School ("Heyer") in Waukesha, Wisconsin, sues the School District of Waukesha (the "District") and Superintendent of Schools Dr. James Sebert (collectively "Defendants") for allegedly terminating her employment in retaliation for exercising her First Amendment rights, in violation of 42 U.S.C. § 1983. Both parties move for summary judgment in their favor. For the reasons further explained below, Plaintiff's motion for summary judgment is denied and Defendants' motion for summary judgment is granted. Plaintiff's complaint is dismissed.

## UNDISPUTED FACTS

    Tempel was employed by the District as a dual-language first grade teacher at Heyer from fall 2018 until her termination on July 12, 2023. (Statement of Stipulated Facts ("Stip. Facts") ¶ 1, Docket # 57.)

*Background*

In 2021, several new members were elected to the District's Board of Education, causing what many members of the Waukesha community perceived as a more conservative perspective shift. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶¶ 1–2, Docket # 64 and Defs.' Resp. to PPFOF ("Defs.' Resp.") ¶¶ 1–2, Docket # 85.) In July 2021, the District suspended diversity, equity, and inclusion training for staff and suspended the work of the District's Equity Leadership Team. (*Id.* ¶ 3.) There was public interest regarding the District's decision to suspend the Equity Leadership Team. (*Id.* ¶ 4.) In August 2021, pursuant to the Controversial Issues Polices, the Board enacted a policy to ban "controversial" signs in the classroom. (*Id.* ¶ 15.) On August 20, 2021, Dr. Sebert issued a letter to announce that the Controversial Issues Policy would ban signage related to Black Lives Matter, Blue Lives Matter, Thin Blue Line, Anti-racist classroom, and other materials. (*Id.* ¶ 17.) The Policy also banned all flags, including Pride flags. (*Id.* ¶ 18.) The District's decision regarding signage garnered attention from the community, parents, students, teachers, staff, and news outlets. (*Id.* ¶ 19.)

On September 30, 2021, the Alliance for Education in Waukesha ("the Alliance") started a change.org petition calling on the District to rescind the signage bans and follow policies and procedures that demonstrate a commitment to equity. (*Id.* ¶ 21.) The Alliance is a group comprised of parents and community members seeking to support a safe, productive, and collaborative school environment for all Waukesha students, teachers, and staff, and create a space for civil discourse regarding education in Waukesha. (*Id.* ¶ 23.) On October 27, 2021, the Alliance sent Dr. Sebert a letter signed by over 200 students, parents, and community members, objecting to the Board's application of the Controversial Issues policy

to remove pro-LGBTQ+ signs. (*Id.* ¶ 24.) The Alliance issued a press release, highlighting how Dr. Sebert's August 20, 2021, ban on pride flags and "Safe Space" signs served to target and marginalize LGBTQ+ students in Waukesha. (*Id.* ¶ 25.)

Tempel asserts that in December 2021, the District made national news for suspending without pay Sarah Whaley, a kindergarten teacher, for pinning a rainbow Pride flag in her classroom and refusing to take it down. (Pl.'s PFOF ¶ 26.) The District asserts that Whaley was suspended for "insubordination" and the District received both positive and negative feedback related to the decision. (Defs.' Resp. ¶ 26.)

On March 25, 2022, the American Civil Liberties Union of Wisconsin ("ACLU") submitted a public records request to the District regarding its application of the Controversial Issues Policy, to determine whether the District was violating constitutional or other civil rights of students and teachers. (PPFOF ¶ 28 and Defs.' Resp. ¶ 28.) The ACLU claimed that LGBTQ+ students faced increased bullying and harassment after the District's signage ban. (*Id.*)

In January 2023, pursuant to the Controversial Issues Policy, the District updated its dress code policy to ban anything that "may be considered political, controversial, or divisive." (*Id.* ¶ 33.) The District was in the press not less than 20 times during the 2021-2022 school year regarding the signage ban, the dress code policy, Sarah Whaley's suspension, and related issues. (*Id.* ¶ 38.)

*Tempel's Tweets[1] and Termination*

Every year, Heyer first grade students participate in a spring concert. (Stip. Facts ¶ 4.) During the 2022-2023 school year, Heyer music teacher, Jared Ziegler, was responsible for the song selection for the musical. (*Id.* ¶ 5.) On March 20, 2023, Ziegler e-mailed first-grade teachers Tempel, Angie Aranda, and Katie Dellar his song list for the Spring Concert. (PPFOF ¶ 45 and Defs.' Resp. ¶ 45.) This list included "Rainbowland" by Miley Cyrus and Dolly Parton. (*Id.* ¶ 46.) Ziegler avers that he decided to consult with Heyer's principal, Mark Schneider, regarding his selection of "Rainbowland" for the Spring Concert "given the District's attitude towards LGBTQ+ flags and rainbows." (Declaration of Jared Ziegler ("Ziegler Decl.") ¶ 10, Docket # 60.) On March 21, 2023, Schneider advised Ziegler that it would be best to choose a different song and Ziegler understood that to mean that the first graders could not sing "Rainbowland" at the concert. (PPFOF ¶ 48 and Defs.' Resp. ¶ 48.) Either Schneider or Ziegler suggested that the first graders sing "Rainbow Connection" by Kermit the Frog instead of "Rainbowland," and Ziegler emailed the first grade teachers on March 21, 2023 that: "Rainbowland is out. Rainbow Connection is in." (*Id.* ¶¶ 49–50.) Ziegler avers that "at some point" on March 21, he spoke with Tempel and conveyed that Schneider questioned whether Miley Cyrus was appropriate for first graders. (Ziegler Decl. ¶ 16.)

On March 21, 2023, at 6:39 p.m., Tempel posted the following tweet on her public Twitter account:

---

[1] While "Twitter" is now known as "X," because it was known as "Twitter" during the relevant times in this case, I will refer to the website as "Twitter" and to the posted messages as "tweets."



📌 **Pinned Tweet**
**Maestra Melissa** @melissatempel · Mar 21
My first graders were so excited to sing Rainbowland for our spring concert but it has been vetoed by our administration. When will it end? @waukeshaschools @DollyParton @MileyCyrus @mileyworld @gsafewi @CivilRights #publicschools

Where everything goes as planned
And I smile
'Cause I know if we try, we could really make a difference in this world
I won't give up, I'll sleep a wink
It's the only thought I think, you know where I stand
I believe we can start living in a Rainbowland

Living in a Rainbowland
Where you and I go hand in hand
Oh, I'd be lying if I said this was fine
All the hurt and the hate going on here
We are rainbows, me and you
Every color, every hue
Let's shine on through
Together, we can start living in a Rainbowland

Living in a Rainbowland
The skies are blue and things are grand
Wouldn't it be nice to live in paradise
Where we're free to be exactly who we are
Let's all dig down deep inside

(Stip. Facts ¶ 7; PPFOF ¶ 54 and Defs.' Resp. ¶ 54.) After this initial tweet, Tempel tweeted multiple times and conducted interviews with the news media about "Rainbowland" between March 21, 2023, and April 1, 2023. (PPFOF ¶ 57 and Defs.' Resp. ¶ 57.) Tempel also engaged with public responses to her tweets. (DPFOF ¶ 19 and Pl.'s Resp. ¶ 19.) On March 22, when a tweet inquired which school was supposed to sing the song, Tempel responded, "Heyer Elementary." (Declaration of Joel S. Aziere ("Aziere Decl.") ¶ 13, Ex. K, Docket # 67-11 at 4). All of Tempel's tweets related to "Rainbowland" were posted outside of work hours and off District property. (PPFOF ¶¶ 58, 61 and Defs.' Resp. ¶¶ 58, 61.)

The District held spring break from Saturday, March 25, through Sunday, April 2, 2023. (Stip. Facts ¶ 14.) On April 3, 2023, after returning from spring break, Dr. Sebert placed Tempel on administrative leave and directed Assistant Superintendent of Human Resources Sharon Thiede to conduct an investigation. (PPFOF ¶ 69 and Defs.' Resp. ¶ 69.) Subsequent

to Tempel's tweets, the District asserts that it received numerous voicemails and emails containing "vulgar and threatening remarks." (Defendants' Proposed Findings of Fact ("DPFOF") ¶ 31, Docket # 69 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 31, Docket # 82.) While Tempel disputes the District's characterization of these messages, she does not dispute that the District received the following three voicemails:

1. "Hey, I heard your school district doesn't like gay people. Fuck you, you fucking retards! Kill yourselves!"

2. "Religious based cultural ignorance-how stupid this is. You are small mindless assholes. Consider changing this or face the consequences,"

3. "You are a fucking cunt for working for that pig. Rot in hell!"

(*Id.*) Yesenia Chaparro, Principal Schneider's secretary, testified that during Heyer's spring break, she received approximately 20 voicemail messages that came through as email messages. (Deposition of Yesenia Chaparro ("Chaparro Dep.") at 24–26, Docket # 34.) She listened to the messages and then forwarded the messages to Schneider. (*Id.* at 26–27.) Upon returning from spring break, Chaparro testified that the emails and voicemails continued and she received approximately 15 to 20 calls per day regarding "Rainbowland." (*Id.* at 27–28.) Chaparro stated that she would alert Schneider to each call she received; however, she did not speak to most of the callers but rather was "mainly getting yelled at." (*Id.* at 28.) Chaparro testified that some of the calls were "concerning" and "intense," including a message saying "something to the effect comparing what had happened recently at the time with a school shooting." (*Id.* at 29.)

Susan Ettinger, the executive assistant to the superintendent and board secretary, testified that she received her first call regarding "Rainbowland" two days after Tempel's

tweet. (Deposition of Susan Ettinger ("Ettinger Dep.") at 36–37, Docket # 35.) Although the school offices were closed during this period for spring break, the District's offices were open. (*Id.* at 37.) Ettinger testified that during spring break, she received approximately 25 to 30 calls per day. (*Id.* at 38.) She testified that the callers mostly screamed at her and "call[ed] us every name in the book," saying "we're not Christian, we're homophobes." (*Id.*) Ettinger stated that the calls continued once Heyer returned from spring break. (*Id.* at 40.)

Following spring break, Deputy Superintendent Joseph Koch requested the presence of the Waukesha Police Department at Heyer and the Lindholm Administration Building. (PPFOF ¶ 99 and Defs.' Resp. ¶ 99.) The parties agree that from April 3, 2023 to April 5, 2023, officers were stationed at Heyer during the school day. (*Id.* ¶¶ 102–04.) Schneider testified that approximately seven to ten teachers and staff members approached him during the week following spring break to express concerns about safety at Heyer as a result of the attention the school was receiving. (Deposition of Mark Schneider ("Schneider Dep.") at 56–57, Docket # 33.) He testified that staff members also approached him with concerns about the "school climate," noting "a lot of animosity amongst staff members." (*Id.* at 60.) Schneider testified that the discord was "significantly different" from anything the school had experienced in the past, noting that people had "very strong opinions." (*Id.* at 60–61.) Schneider stated that some staff members came to him with concerns regarding "chatter in the staff lounge" that created feelings of "unease when conversations were occuring and assumptions that were being shared." (*Id.* at 65.) He noted that while he has dealt with complaints regarding co-worker conversations in the staff lounge before, it was never "to that extent" where he was receiving one to two complaints per day. (*Id.* at 65–66.) Schneider testified that he put together a student service meeting to address the "significant amount of

concern among staff." (*Id.* at 67–70.) He further testified that he observed distractions and "strong feelings" amongst staff that impacted their preparation time for class. (*Id.* at 74.)

A school board meeting was held on April 12, 2023 in which dozens of community members attended to discuss the "Rainbowland" decision. (PPFOF ¶ 122 and Defs.' Resp. ¶ 122.) The Alliance organized and facilitated a sing-along before the April 12 Board meeting to show support for Tempel; the Board meeting and rally were covered by the press. (*Id.* ¶¶ 123–24.) On May 10, 2023, Thiede issued her investigative report concluding that Tempel had violated three district policies and a page of the employee handbook noting that "Ms. Tempel claimed that she posted on social media and gave interviews to media outlets regarding the District's decision concerning 'Rainbowland' because she thought it would be something the public would be interested in and she wanted to engage them in dialog." (*Id.* ¶ 125.) Thiede ultimately recommended to Dr. Sebert that Tempel be terminated. (*Id.* ¶ 126.) On May 15, 2023, Dr. Sebert recommended to the school board that Tempel be terminated. (*Id.* ¶ 127.) The school board voted to terminate Tempel's employment on July 12, 2023, concluding that Tempel's tweets and interviews with the news media about "Rainbowland" violated Board Policy 3179 ("Employee Concerns"), Board Policy 3213 ("Student Supervision and Welfare"), Board Policy 3310 ("Employee Expression in Noninstructional Settings"), and the Communications and Suggestions Policy on Page 7 of the Employment Handbook for Professional Staff Members. (*Id.* ¶¶ 130–46; (Deposition of Patrick McCaffery at 31–46, Docket # 45).)

## SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), a party can seek summary judgment upon all or any part of a claim or defense asserted. The court shall grant summary judgment if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

In this case, both Tempel and Defendants move for summary judgment in their favor on Tempel's First Amendment retaliation claim. When both parties move for summary judgment in their favor on the same issue, "the court must consider the evidence through two different lenses." *Lessley v. City of Madison, Ind.*, 654 F. Supp. 2d 877, 890 (S.D. Ind. 2009).

Specifically, "[w]hen considering defendants' motion[ ], the court gives plaintiffs the benefit of conflicts in the evidence and favorable inferences. When considering plaintiffs' motion[ ], defendants receive those benefits." *Id.*

## ANALYSIS

1.    *Legal Standard*

Tempel sues the District and Dr. Sebert for First Amendment retaliation under § 1983. It is well-established that public employees "do not relinquish their First Amendment rights as a condition of entering government service." *Kilborn v. Amiridis*, 131 F.4th 550, 557 (7th Cir. 2025). Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006). However, like private employers, the government "needs to exercise control over its employees to provide public services effectively," which it simply could not do "if every employment decision became a constitutional matter." *Kilborn*, 131 F.4th at 557 (internal quotation and citation omitted). Thus, when "a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom" *Garcetti*, 547 U.S. at 418, which may be particular to that employee's role and whether it is a public-facing role of "trust," *Hedgepeth v. Britton*, No. 24-1427, 2025 WL 2447077, at *3 (7th Cir. Aug. 26, 2025).

A public employee bringing a First Amendment retaliation claim must prove three things: (1) that she engaged in constitutionally protected speech, (2) that she suffered a deprivation likely to deter such speech, and (3) that the speech was a motivating factor in her termination. *Id.* Whether a public employee's speech is protected under the First Amendment follows a two-part framework established by the Supreme Court in *Connick v. Myers*, 461 U.S.

10

138 (1983) and *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563 (1968). First, the court must determine whether the employee is speaking as a citizen on a matter of public concern. *Kilborn*, 131 F.4th at 557. If so, the court then balances the employee's interest "in commenting on matters of public concern" against the government employer's interest "'in promoting the efficiency of the public services.'" *Hedgepeth*, 2025 WL 2447077, at *3 (quoting *Pickering*, 391 U.S. at 568). "Even speech addressing matters of public concern may lose constitutional protection if the government's interest in workplace efficiency outweighs the employee's interest in speaking freely." *Id.*

   *2.     Application to this Case*[2]

   Again, a public employee's speech is only protected under the First Amendment if the employee was (1) speaking as a private citizen and (2) the matter was of public concern. The parties dispute both questions.

   2.1     Whether Tempel Spoke as a Private Citizen

   Statements made pursuant to a public employee's official duties are not protected by the First Amendment. *Garcetti*, 547 U.S. at 421 (holding that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from

---

[2] Defendants argue that in addressing Tempel's First Amendment retaliation claim, I am limited to considering the evidence the school board had before it when making its decision to terminate Tempel's employment. (Docket # 99 at 3.) Defendants contend that Tempel's claim challenges the District's decision to terminate her employment; thus, any evidence not before the Board when making its decision is legally irrelevant and should be disregarded for purposes of this motion. (*Id.* at 3–4.) Tempel moves to strike section one from Defendants' reply brief in support of their summary judgment motion; the section addressing the relevancy of the evidence not before the Board. (Docket # 101.)

Tempel is not alleging her due process rights were violated; she is alleging she was retaliated against for exercising her First Amendment rights. While the evidence presented to the Board and its stated reasons for terminating her employment may certainly be relevant to Tempel's claim, the realm of relevant evidence does not end there. Because it is entirely proper to consider evidence that was not presented before the school board, so long as it otherwise meets the standards of relevance and admissibility, Tempel's motion to strike is granted.

employer discipline"). And whether one engaged in constitutionally protected speech is a question of law. *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 704 (7th Cir. 2010). The "mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." *Lane v. Franks*, 573 U.S. 228, 240 (2014). Rather, the "critical question" is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.*

Defendants contend that Tempel was not speaking as a private citizen because she took numerous steps to identify herself as a District teacher when she posted on social media and spoke during interviews. (Docket # 70 at 6.) Defendants point to the fact Tempel tweeted under the name "Maestra Melissa," with "maestra" meaning a female teacher in Spanish; that Tempel used the phrases "my first graders," "our spring concert," and "our administration" in the tweet; and that Tempel tagged the District in her tweet. (*Id.* at 7.) Defendants further point to Tempel's testimony during her termination hearing before the school board in which she stated that she's "always a teacher," even when she is "out and about" at the grocery store and runs into a former student. (*Id.* at 9.) Tempel argues, however, that she tweeted from her personal account, using her personal cell phone, and conducted all tweets and interviews outside of school hours and off school property. (Docket # 65 at 13.)

Defendants' argument misses the mark. The critical question is not whether the employee's speech is "inextricably linked to her employment with the District" or even whether she "took numerous steps to identify herself as a teacher" in the District while speaking. (Defs.' Resp. to PPOF ¶ 68.) The "critical question" is whether the "speech at issue *is itself* ordinarily within the scope of an employee's duties." *Lane*, 573 U.S. at 240 (emphasis

added). The Defendants have stipulated that Tempel's official job duties *did not* include engaging with social media, engaging with the press, or making public announcements on behalf of the District. (Stip. Facts ¶ 12.) The *Pickering* Court specifically stated that teachers are "the members of a community most likely to have informed and definite opinions" about issues regarding the operations of the schools and that "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." 391 U.S. at 572. The *Pickering* Court's statement, however, makes little sense if a teacher's speech is unprotected by the First Amendment simply because she identified herself as a teacher when speaking.

For these reasons, the undisputed facts establish that Tempel was speaking as a private citizen when she made her statements.

### 2.2 Whether Tempel Spoke on a Matter of Public Concern

Whether a government employee's speech addresses a matter of public concern depends upon "the content, form, and context of [the speech] as revealed by the whole record." *Gustafson v. Jones*, 290 F.3d 895, 906–07 (7th Cir. 2002) (internal citation omitted). Of the three factors, content is most important. *Id.* The "public concern" element is satisfied if the speech can fairly be said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee. *Id.* Whether a statement rises to the level of public concern is a question of law. *Kristofek v. Vill. of Orland Hills*, 712 F.3d 979, 984 (7th Cir. 2013).

Defendants argue Tempel's speech was merely an expression of her dissatisfaction with an administrative decision regarding the selection of songs for her first grade class's spring concert. (Docket # 70 at 11.) Defendants argue the issue "was entirely personal to Ms. Tempel, tied to her specific classroom, and concerned only her own self-interest as an

13

employee." (*Id.*; Docket # 86 at 12 (arguing that Tempel's speech was "motivated by personal reasons rather than a desire to raise awareness of a broader societal issue").) Defendants further contend that Tempel "created a false narrative" regarding the District's "war on rainbows" and then "tried to use that false narrative to establish a matter of public concern." (Docket #70 at 13–15.) Defendants point to the language of the tweet which "framed her complaints in personal terms" and repeatedly used "possessive determiners such as 'my students' and referring to her classroom of '24 students'" and argue that the substance of her speech "centered almost entirely on the District's 'Rainbowland' decision and how it affected her students and classroom—not any broader policy or public concern." (Docket # 86 at 12.)

I disagree. As to Tempel's motive, the Seventh Circuit has held that "[m]otive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee or if the only point of the speech was to further some purely private interest." *Gustafson*, 290 F.3d at 908 (internal quotation and citation omitted). If, however, the employee was advancing some private interest with her speech, the claim survives as long as the employee also intended to bring to light the issue of public concern. *See id.*; *see also Kristofek*, 712 F.3d at 986 (finding that "if an objective of the speech was also to bring about change with public ramifications extending beyond the personal, then the speech does involve a matter of public concern"). In other words, even if Tempel's motive was mixed, it does not take her speech out of the realm of a matter of public concern.

The undisputed evidence demonstrates that Tempel was speaking on a matter of public concern. The speech's context is particularly important in this case. Defendants do not dispute that multiple decisions occurred between 2021 and 2023 that caused controversy in the

14

Waukesha community, such as the suspension of diversity, equity and inclusion training for staff and the work of the District's Equity Leadership Team; the introduction of the parental transparency resolution; the banning of "controversial" signs in the classroom; and the suspension of a kindergarten teacher for "insubordination" after she pinned a rainbow Pride flag in her classroom and refused to take it down." (PPFOF ¶¶ 3–4, 12–26.) While Defendants argue this background is irrelevant, Tempel's speech cannot be divorced from the context in which it arose.

The District's actions lead to community responses such as a change.org petition started in September 2021 regarding the signage ban that garnered over 4,000 signatures (*id.* ¶¶ 21–22); the Alliance sending a letter signed by over 200 people in October 2021 to Dr. Sebert regarding the effect of the Controversial Issues policy on the LGBTQ+ community (*id.* ¶ 24); the Alliance's "Rainbow Day" event organized in support of Whaley (*id.* ¶ 27); and the ACLU's involvement in looking into how the application of the Controversial Issues policy affected LGBTQ+ students (*id.* ¶ 28).

In this context, it is difficult to see Tempel's tweet as merely an expression of a personal grievance. Tempel tweeted "When will it end?" and tagged the Twitter handles for the U.S. Department of Justice Civil Rights Division and GSAFE, a non-profit organization whose goal is to create just schools for LGBTQ+ youth in Wisconsin by developing the leadership of LGBTQ+ youth, supporting Gay-Straight Alliances, training educators, advancing educational justice, and deepening racial, gender, trans, and social justice. (*Id.* ¶¶ 55–56.) Additionally, Ziegler, the music teacher, averred that he double-checked his song choice of "Rainbowland" with Heyer's principal because of "the District's attitude towards LGBTQ+ flags and rainbows." (Ziegler Decl. ¶ 10.) And Tempel's tweets regarding the "Rainbowland"

decision garnered press coverage (PPFOF ¶ 64 and Defs.' Resp. ¶ 64); many emails and telephone calls from the public (*id.* ¶¶ 75–84); and protests organized in support of Tempel by the Alliance that were covered by the press (*id.* ¶¶ 74, 123–24). "[W]here the public takes such an active interest in the matter it is hard to argue that the speech was purely private." *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997). Thus, I find as a matter of law that Tempel was speaking on a matter of public concern.

### 2.3   Balancing of Interests Under *Pickering*

As Tempel was speaking as a private citizen on a matter of public concern, I must now turn to *Pickering* to weigh Tempel's First Amendment interests against the District's interest in workplace efficiency. This too, is a question of law for the court. *Kokkinis v. Ivkovich*, 185 F.3d 840, 843 (7th Cir. 1999). Under *Pickering*, the employer bears the burden of showing that its interest in workplace efficiency outweighs the employee's right to speak. *Hedgepeth*, 2025 WL 2447077, at *4. The Seventh Circuit has provided a nonexclusive list of seven factors that may be relevant to *Pickering* balancing:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decisionmaking; and (7) whether the speaker should be regarded as a member of the general public.

*Darlingh v. Maddaleni*, 142 F.4th 558, 565–66 (7th Cir. 2025). The court has made clear, however, that the "seven-factor list is not a doctrinal touchstone and certainly not a straitjacket." *Id.* at 566. It is unnecessary to consider each factor, nor is it "particularly informative" to "merely count how many factors line up on each side." *Id.* (internal quotation and citation omitted). Thus, "[r]ather than marching through the list," the Seventh Circuit

16

states that it is "more meaningful to focus on the specific considerations that bear weight in evaluating the competing interests in the specific context of th[e] case." *Id.*

In the context of public education, "the critical focus of each factor is the effective functioning of the public employer's enterprise"; thus, "[i]nterference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function, so avoiding such interference can be a strong state interest." *Hedgepeth*, 2025 WL 2447077, at *4 (internal quotation and citation omitted). The level of disruption needed to justify a restriction, however, varies with context. *Id.* "The more serious and politically charged the message, the stronger the government's justification must be." *Id.* Further, employers enjoy "more leeway in restricting the speech of a public-facing employee like a classroom teacher who must maintain public trust and respect to be effective." *Id.* (internal quotation and citation omitted). And finally, "the time, place, and manner of the speech factor into the overall analysis." *Id.*

Again, both parties move for summary judgment on *Pickering* balancing. The defendants, who carry the burden on the *Pickering* factors, argue that their interest in addressing potential security risks, disruption, and disharmony in the school and District outweigh Tempel's speech interests. Tempel does not dispute that her tweets caused some disruption; she acknowledges that both Chaparro and Ettinger received additional telephone calls, voicemails, and emails, some of which were "vulgar in nature." (Docket # 83 at 14–15.) Nor does she dispute that police were present at Heyer for one week after the school's return from spring break and for two days at the District office. (*Id.* at 15.) She argues, however, that this disruption was insignificant. She asserts that staff members continued to perform their

17

jobs and the school did not close. (*Id.* at 13–16.) And she argues that the police presence was "arguably unnecessary." (*Id.* at 15.)

Even looking at the evidence in the light most favorable to Tempel, I am unconvinced that the level of disruption shown in the record subsequent to Tempel's tweets was as insignificant as Tempel contends. As to potential security risks and disruption, the record indicates that soon after Tempel tweeted, both Heyer's office and the District's main office received upwards to twenty calls per day regarding the "Rainbowland" decision, many of which consisted of the caller subjecting the recipient to yelling and insults. (Chaparro Dep. at 27–29; Ettinger Dep. at 38–40.) During spring break, Schneider received multiple emails from staff and parents expressing concern about school safety. (Aziere Decl. ¶¶ 3–7, Ex. A–E, Docket # 67-1–67-5.) Thus, on the weekend prior to Heyer's return from spring break, Schneider emailed all Heyer staff to reassure them that safety and security is their main priority and informing them that police would be outside the building during arrival and dismissal and as needed throughout the day. (Aziere Decl. ¶ 10, Ex. H, Docket # 67-8.) And indeed, following spring break, police officers were stationed at both Heyer and the District's office for several days. (PPFOF ¶ 102–04 and Defs.' Resp. ¶ 102–04.)

Chaparro testified that Heyer typically receives approximately 40 calls per day. (Chaparro Dep. at 11.) However, in the wake of Tempel's tweets, she received an additional 15 to 20 calls. (*Id.* at 27.) And these additional calls were not easy calls to take—people were calling to "voice their opinions" at her and did so in an abusive manner. (*Id.* at 28.) Ettinger testified similarly, stating she was called "every name in the book" such as a "homophobe" during her daily 25 to 30 "Rainbowland" related calls. (Ettinger Dep. at 38.) Further, even if

18

the police officers were stationed outside of the school "out of an abundance of caution," that does not make their presence any less disconcerting to the staff and students.

As to disharmony amongst Heyer staff, Schneider testified that upon return to school after spring break, he observed an increased level of discord between his staff members that was "significantly different" from anything the school had experienced before. (Schneider Dep. at 60–61, 65–66.) He testified to receiving one to two staff complaints per day regarding a colleague's behavior, prompting him to organize a "student services meeting" to address the "significant amount of concern among staff." (*Id.* at 65–70.) Schneider further testified observing distractions and "strong feelings" amongst staff that impacted their preparation time for class. (*Id.* at 74.)

Tempel argues that her speech did not cause disharmony amongst Heyer's staff and to the extent there was disharmony, it pre-dated her tweets. (Docket # 83 at 16–18.) While Schneider acknowledged that his staff has not always gotten along perfectly in the past, he testified that Heyer had never before experienced the level of staff discord he observed in the wake of Tempel's tweets. (Schneider Dep. at 65–67.) Again, the discord was so significant that Schneider testified he organized a "student services meeting" that, for the first time, was held to allow staff to voice their concerns and feelings as staff members as opposed to what the meetings were usually held for—to address student needs. (*Id.* at 67–71.) The record contains multiple emails from staff members sent to Schneider and Sebert during spring break expressing concern for school safety and the negative attention Tempel's tweets could bring to the school. (*See, e.g.*, DPFOF ¶ 36 and Pl.'s Resp. ¶ 36.) Thus, even if any single staff member did not express concerns, the record supports the existence of discord and distraction amongst staff members in the wake of Tempel's tweets.

Thus, while Tempel contests the severity of the disruption, the Seventh Circuit has found that school officers can act "to nip reasonable predictions of looming disruption in the bud," so long as those predictions are reasonable. *Hedgepeth*, 2025 WL 2447077, at *4. And in this case, given the evidence of staff discord, it was not unreasonable for the District to act before the disruption potentially worsened.

Additionally, Tempel's method of speech further weighs in favor of the District. While speech made outside of the workplace may be less disruptive to the efficient functioning of the employer, as the Seventh Circuit noted, speech made on social media can carry a "clear risk of amplification" and therefore disruption. *See Hedgepeth*, 2025 WL 2447077, at *6; *see also Liverman v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) ("A social media platform amplifies the distribution of the speaker's message—which favors the employee's free speech interests—but also increases the potential, in some cases exponentially, for departmental disruption, thereby favoring the employer's interest in efficiency.").

While Tempel tweeted from a personal account outside of school hours and off school grounds, she identified herself as a first grade teacher and named her school and her District in the course of her tweets. As cited above, when a member of the public asked, "are you a teacher in Waukesha" and "what school was supposed to sing [Rainbowland]?," Temple responded by stating "Heyer Elementary." (Docket # 67-11 at 4.) When asked how many students were in her class, Tempel responded "24," but that the school had about 65 first graders in total. (*Id.* at 6.) This predictably attracted widespread attention and criticism of the school. And her identification as a teacher at that school only increased the statements' attention. It is undisputed that Tempel's tweet garnered national media coverage, with Tempel participating in interviews with both local and national media discussing the

20

"Rainbowland" decision. (DPFOF ¶¶ 28–29 and Pl.'s Resp. ¶¶ 28–29.) The court has "repeatedly recognized that public school teachers occupy a unique position of trust"; thus, employers have "more leeway in restricting the speech of a public-facing employee like a classroom teacher who must maintain public trust and respect to be effective." *Hedgepeth*, 2025 WL 2447077, at *4, 6.

Finally, Tempel argues that her speech concerned debate that was vital to informed decision-making; specifically, the "broader public discussion on matters of significant public concern, including discrimination, LGBTQ+ rights, marginalization and suicide risk, and inclusion in education." (Docket # 65 at 17–20; Docket # 83 at 10–12.) As discussed above, I agree with Tempel that her speech was on important public matters. But in weighing the *Pickering* factors, the question is not whether Tempel's speech implicates the First Amendment (it does), it is whether the District's interest in workplace efficiency outweighs her right to speak. As the Seventh Circuit noted in *Hedgepeth*, there are circumstances where the weighing of the *Pickering* factors requires the court to presumptively elevate a teacher's expressive interest over the employer's interest in avoiding disruption such as cases where the teacher has "special knowledge." *See* 2025 WL 2447077, at *5. As the court of appeals explained, special knowledge contemplates situations where an employee gains knowledge through her status as a public employee that is vital to public decision-making, such as when an employee learns of misconduct and brings the issue to light or testifies to the existence of corruption in the allocation of public funds. *Id.* at *6. Tempel, in contrast, did not have "special knowledge" gained from her employment that would assist the public in decision-making. On the contrary, she asserts that she spoke out after "years of sustained public criticism of, and media attention about, the District's Controversial Issues Policy." (Docket # 83 at 10.) In other

words, though the public did not specifically know of the Rainbowland controversy before Tempel's tweets, the public already had knowledge of controversy surrounding the District's policies affecting LGBTQ+ rights.

The undisputed facts show that Tempel's tweets resulted in substantial disruption to the school and District. Thus, weighing the factors relevant to *Pickering* balancing, I find that the District's interest in workplace efficiency outweighs Tempel's First Amendment interest in expression. Because Tempel has not shown she engaged in constitutionally protected speech, her retaliation claim fails. I need not address the remaining elements of her claim.

## CONCLUSION

Nothing said here is intended to devalue the role of public school teachers in speaking as private citizens on matters of public concern. However, the law requires a delicate balancing of a public teacher's First Amendment right to expression and the government employer's right to exercise control over its employees to provide public services effectively. On the undisputed facts in this case, the *Pickering* balance favors the District's interest in effectively running its operations over Tempel's interest in expression. For these reasons, summary judgment is granted in favor of the District and against Tempel. The case is dismissed.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that Plaintiff's Motion to Strike (Docket # 101) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment (Docket # 56) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (Docket # 66) is **GRANTED**.

**FINALLY, IT IS ORDERED** that judgment is entered in favor of Defendants and against Plaintiff. This case is dismissed. The Clerk of Court will enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 29th day of September, 2025.

BY THE COURT:

NANCY JOSEPH
United States Magistrate Judge